OCCIDENTAL & O. S. S. CO. v. SMITH et al. (two cases).

(Circuit Court of Appeals, Ninth Circuit. February 10, 1896.)

Nos. 191, 192.

1. COLLISION—STEAMERS IN CHANNEL—FOG.

The steamship O., entering the Bay of San Francisco in a thick fog, collided with the steamer C. in the narrowest part of the Golden Gate, which is about seven-eighths of a mile wide. The C. was coming out of the bay, and was struck on her port bow by the bow of the O., which penetrated nearly 10 feet. It was claimed by the O. that she was proceeding "dead slow" near the northern shore, giving proper fog signals; that she saw the C. half a mile distant, 2½ points on her starboard bow, and signaled an intention to go to port, which was assented to; but that the C., instead of going to port, turned in the opposite direction, whereupon the O. put her engines full speed astern, stopping her headway before collision. Held, on a libel for causing the death of certain passengers on the C., that if the claim that the O. was near the north shore, and that the collision occurred considerably northward of mid-channel was true, then, if the C. also was north of mid-channel, the vessels, on first perceiving each other, must have been head on, or nearly so, and that the O. consequently assumed all risks of collision in signaling that she would go to port, contrary to rule 15 of the international regulations, which requires the vessels to pass port to port; and that, if the vessels were not nearly end on, they must have been on crossing courses, the O. having the C. on her starboard side, and being bound by rule 16 to keep out of her way.

2. SAME.

Held, further, upon the evidence as to the distances traversed, and especially from the force of the blow, that the O. must have been running over 10 knots an hour, and that the collision took place near mid-channel; that the failure of the C. to go to port was due to the tide rip, which here sets northward across the channel to about midway thereof;

and that the O. was in fault for not reversing as soon as she perceived that the C. was not answering her helm, and for failing to take into consideration the influence of the tide rip, which she knew to exist. 61 Fed. 338, affirmed.

3. SAME—STEAMERS IN NARROW CHANNELS.

Steamers entering the Golden Gate into the Bay of San Francisco are subject to rule 25 of the International Code, which requires steam vessels in narrow channels to keep on that side of the fairway which lies on their starboard side, and an alleged custom by which large vessels take the north side in entering, is bad in principle and contrary to law, and affords no ground for exempting a vessel from liabilities incurred by disregarding the rule.

Appeals from the District Court of the United States for the Northern District of California.

The history and facts of these cases are given in the opinion of the district judge (61 Fed. 338) as follows:

"On the morning of August 22, 1888, between 9 and 10 o'clock, a collision took place in the entrance of the Bay of San Francisco between the steamships Oceanic and City of Chester. The latter vessel was sunk, and became a total loss, and several passengers on board of her lost their lives. Among those were Henry Smith and his daughter, Myrta Smith. Two actions were instituted in this court against the Occidental & Oriental Steamship Company and the Pacific Coast Steamship Company, owners, pro hac vice, of the Oceanic and City of Chester, respectively, as co-defendants, to recover damages for the death of these two persons,—one of the suits being brought under section 377 of the Code of Civil Procedure of the state of California by Eliza A. Smith, as administratrix of the estate of the deceased Henry Smith, for herself and on behalf of Henry F. Smith and George C. Smith, infants and children of the deceased, as their guardian, praying judgment for the sum of $75,275; the other suit being brought under section 376 of the same Code, also by Eliza A. Smith, to recover damages for the death of Myrta Smith, an infant daughter of this plaintiff, in the sum of $20,000. These actions were brought originally with a view to the plaintiffs availing themselves of such common-law remedy as this court could afford by virtue of the judiciary act; but by a stipulation entered into by the parties, and filed September 7, 1893, it was agreed that these two actions were admiralty causes in personam, and should be treated as such. The causes were thereupon transferred from the common law to the admiralty side of the court; all objections and exceptions to the form of such proceeding, or of any proceeding prior thereto, as not being in accordance with the admiralty rules and practice of this court, being expressly waived. It was further stipulated in open court that the two causes should be consolidated for the purpose of trial, and that separate judgments might be awarded in the cases. On the 1st of September, 1890, the Pacific Coast Steamship Company, as charterer and lessee of the City of Chester, filed a petition in this court for a limitation of its liability under sections 4282–4289, Rev. St. U. S. Thereafter such proceedings were had that a decree was entered, giving the Pacific Coast Steamship Company the benefit of a limitation of its liability, and fixing the extent of such liability at $75,—the appraised value of a small boat saved from the wreck of the City of Chester. In view of this fact, the libelants, on November 9, 1892, dismissed their action as to the Pacific Coast Steamship Company, and thereupon the liability of the City of Chester was eliminated from the case. * * * The Oceanic is a four-masted steamer of 3,808 tons register, with a length of 438 feet, a beam of 40¾ feet, and a draught of 25 feet. She had been engaged in making voyages between the port of San Francisco and the ports of Hong Kong and Yokohama. She was thoroughly equipped and appareled, completely officered and manned, and in every respect a staunch and seaworthy vessel. On the morning of the collision she was entering the harbor of San Francisco, having just returned from one of her periodical trips to China and Japan. She carried, in addition to her cargo, about 1,000 passengers. She was leased by the White

Star Company to the Occidental & Oriental Steamship Company. The City of Chester was a steamship leased to and operated by the Pacific Coast Steamship Company. She was used in the coasting trade, and at the time was running between this port and that of Eureka, in this state. She had a gross tonnage of about 1,100 tons, and a net tonnage of about 860 tons; was about 205 feet in length, 32 feet in beam, and 16 feet in depth. On the morning of the collision she was just proceeding on one of her regular trips, laden with freight and passengers, and was making her way out of this port. * * * The collision took place between half past 9 and a quarter of 10 on the morning of August 22, 1888, at the inner entrance to San Francisco Bay, known as 'Golden Gate Channel.' It occurred at some point between Fort Point and the land opposite, known as 'Lime Point.' The precise locality, owing to the fog then prevailing, and the conflicting testimony on that point, is somewhat involved in doubt, and can only be determined approximately. For a better understanding of the locality, and the movements of the two vessels, reference may be had to the accompanying map:

"The width of the channel where the collision took place is stated to be about seven-eighths of a nautical mile, or, by chart measurement, about 5,200 feet. It is the narrowest point in the channel, and the whole body of water is navigable, almost from shore to shore. The sea, on that morning, was calm. The tide was flood. The pilot on the Oceanic fixes low water at 6:15 in the morning. Ferdinand Westdahl, of the coast and geodetic survey, fixes low water, by the tide tables, a little earlier,—5:33. The difference is immaterial. At the time of the collision the flood tide had been running in for about three hours and a half, or nearly four hours. The testimony shows that in entering the channel the young flood tide makes on along the south shore, striking the land just outside of Fort Point, and from there deflects, and sheers off across the channel, nearly due north, towards Lime Point, until it reaches about mid-channel,—sometimes beyond it, depending upon the force of the current,—where it resumes the same course as the true tide coming in mid-channel. The evidence shows that there is a tide rip of considerable force from Fort Point to mid-channel, deflecting the course of vessels entering it, and making it necessary that in crossing the current outward they should starboard their helms, to make the rip and preserve their courses."

After a full and complete analysis of the evidence, the consideration of the statutes and rules of navigation, and review of adjudged cases of similar kind, the opinion of the district judge gives the conclusion arrived at as follows:

"In view of these established rules of navigation, the conclusion is reached that the Oceanic was at fault in her movements, and failing to use ordinary care in attempting to pass the City of Chester, and she is mutually responsible with the City of Chester for the damages resulting from the collision."

In accordance with the opinion of the court, decrees were entered in the case of Henry F. Smith et al. v. Occidental & Oriental S. S. Co. in favor of the libelants for $10,000 and costs, and in the case of Eliza A. Smith v. Occidental & Oriental S. S. Co. in favor of the libelant for $1,000 and costs; and in each case the Occidental & Oriental S. S. Co. appealed.

W. H. L. Barnes and Frank Shay, for appellant.
Clinton M. White and Wm. H. Cobb, for appellees.

Before GILBERT, Circuit Judge, and HANFORD and HAW-LEY, District Judges.

HANFORD, District Judge (after stating the facts). The appellant contends for the reversal of the decrees upon the ground that, in order to make out a case against the Oceanic, it was incumbent upon the plaintiff to prove by a preponderance of the evidence the commission of some act which should not have been committed, or the omission of some duty which should have been performed, and which act of commission or omission on the part of the Oceanic was the direct or approximate cause of the injury complained of; and that there was a total failure to introduce such proof, there being no proof whatever showing negligence in the conduct of the Oceanic. It is insisted that as the Oceanic entered the Golden Gate its officers and crew were at their proper stations; that an efficient lookout was kept, and proper discipline maintained; that the Oceanic was in all respects found and equipped in the most complete manner, and was under perfect command; that the proper fog signal was given, and had been given by blasts of the steam whistle sounding

at intervals of less than a minute for several hours preceding the collision; that for a considerable time preceding the collision the speed of the Oceanic had been moderate, running from half speed to slow, dead slow, and with several stops, and for 11 minutes preceding the collision her speed had been dead slow, with only sufficient movement of her engines to maintain steerage way; that the master and pilot of the Oceanic saw the Chester through the fog at a distance of half a mile, 2½ points off the starboard bow of the Oceanic; that the Chester was moving at full speed; that the Oceanic immediately sounded two blasts of the steam whistle, indicating her purpose to go to port and pass on the starboard side, and at the same time the helm of the Oceanic was put hard a-starboard; that the master of the Chester answered said signal with two blasts of the steam whistle, which meant that the Oceanic's signal was understood, and that the Chester assented, and would act accordingly; that in a short interval the same signals were again interchanged; that, if the Chester had acted according to the signals given and responded to, the vessels would have passed each other safely; that after the second interchange of signals the master of the Oceanic observed that the Chester did not go to port pursuant to her signal, but turned in the opposite direction; he then instantly ordered the engines of his vessel to be put to full speed astern, and the order was immediately obeyed; that said order was given and obeyed about two minutes before the collision occurred; that at the time of the collision the Oceanic's headway had been stopped, and she was beginning to move backward; that the Chester swung around and struck the prow of the Oceanic, and was so injured by force of the blow that she sank.

An important fact established by uncontradicted testimony is the fact that the flood tide, entering San Francisco harbor, makes in along the south shore, striking the land just outside of Ft. Point, and from there deflects and sets with a strong current nearly due north towards Lime Point until it reaches about mid-channel, where it turns, taking a straight course into San Francisco Bay. The narrowest part of the entrance to San Francisco Bay is between Ft. Point and Lime Point, and this current setting northward from Ft. Point when the tide is flooding creates a tide rip rendering navigation across it extremely difficult. A vessel outward bound, upon striking the tide rip, is liable to be deflected from her course and slewed to starboard by force of the current. Another fact is that the collision occurred somewhere between Ft. Point and Lime Point. As the City of Chester, after signaling that she would go to port, behaved exactly as she would if caught by the tide rip, it is natural to infer that the vessels, at the time of signaling to each other, were both on the south side of mid-channel; and, as the first signal was given by the Oceanic, counsel for the appellant have labored to convince the court that in entering the Oceanic hugged the north shore, and that the collision actually occurred a considerable distance to the northward of mid-channel. To illustrate the testimony and indicate the course of the Oceanic from a point two miles out-

side of Point Bonita and the place of the collision, the accompanying map was introduced by the appellant:

The course of the Oceanic from the ocean outside the headlands to the place of the collision near Lime Point, is indicated on this map by a straight black line, and the course of the City of Chester by the black line curving to the point of meeting the Oceanic, and the sweep of the tide around Ft. Point is indicated by the curving black lines. The course of the Oceanic as indicated by this diagram was changed when off Point Bonita, from N. E. by E. to N. E. ½ E., taking her across the channel and across the course of outward-bound vessels. If the court should find as a fact that the course of the Oceanic in entering, and her position at the time of coming in sight

of the City of Chester, were as claimed by the appellant, such finding would not exculpate the Oceanic, unless the position of the Chester was south of mid-channel; for if, at the time of giving passing signals, both vessels were near mid-channel, or if the positions and courses of the two vessels made it necessary for them to pass each other in the narrows, and on the same side of mid-channel, the law of the road required each to turn to the right, so as to pass each other port to port. And the Oceanic, in taking the initiative by signaling to pass on the starboard hand, assumed the risk of all consequences. If both vessels were north of mid-channel, in that comparatively narrow passageway, they must have appeared to each other at a distance of half a mile to have been approaching each other end on, or nearly so. Each vessel was therefore required, by article 15 of the revised international rules and regulations for preventing collisions at sea, adopted by act of congress of March 3, 1885 (23 Stat. 438–441), to alter her course to starboard, so as to pass on the port side of the other. If, however, they were not meeting end on, or nearly so, then necessarily the two vessels were on crossing courses, and the Oceanic had the Chester on her starboard side, and it was made her duty, by article 16, to keep out of the way of the other vessel, and failure to do so in view of the claim made on her behalf that she was officered, manned, and equipped in the most perfect and complete manner, and under perfect command, was inexcusable. The position in which the witnesses for the appellant place the Oceanic, hugging the north shore, proves too much, for the collision could not have occurred without fault on the part of her officers. Unless the City of Chester, from a position southward a sufficient distance to justify passing under a starboard helm, changed her course, and crossed the channel, she could not have swung sideways against the bow of the Oceanic, as counsel for the appellant would have us believe. This theory is contrary to the evidence, and wholly unreasonable. There is no probability that the Chester threw herself across the bow of the Oceanic, unless she was deflected from her course by the tide rip, and according to the testimony the current would not have sufficient force to have caused the misadventure so far north of mid-channel, as the witnesses for the appellant have located her. We consider, therefore, that the district court was right in finding that the place of the collision was near mid-channel, and, if it were not so, the appellant would fare no better in the result. This court might well affirm the decrees of the district court for the reasons given in the opinion of the district judge. We have deemed it proper, however, in view of the earnest manner in which able counsel have presented the cause for the appellant, to give careful attention to the evidence and all the facts appearing in the record, and, having done so, we have, nevertheless, been led to the same conclusion as that announced by the district court.

This case affords an opportunity which should not be lost for emphasizing another important rule for preventing collisions, which must be observed by navigators. This is found in article 21 of the international rules, above referred to, and article 25 of the act of August 19, 1890 (1 Supp. Rev. St. [2d Ed.] 781–788), which reads as

follows: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fair way or mid-channel which lies on the starboard side of such vessel." The statutes of California contain a similar provision, to which reference was made in the opinion of the district judge. This rule was violated by the Oceanic in entering the Golden Gate on the occasion of the disaster involved in these suits, and the only excuse offered for taking the north side is that it is customary for large vessels in entering to take the north side. We cannot find in the testimony or argument of counsel any attempt to give a reason for the alleged custom, and, if it be true that there is such a custom, it is bad in principle, and contrary to law, and the courts will not recognize it as affording any ground for exempting a vessel from liabilities incurred by disregarding the law. The Victory, 15 C. C. A. 490, 68 Fed. 395; The Britannia, 153 U. S. 130, 14 Sup. Ct. 795. The decrees of the district court are affirmed, and the causes remanded for further proceedings in accordance with this opinion.