## THE YARMOUTH.

### (District Court, D. Massachusetts. March 19, 1900.)

### No. 1,031.

1. COLLISION—STEAMERS MEETING IN FOG—DISOBEDIENCE OF RULES.

Article 25 of the new inland navigation rules, which requires steam vessels to keep on the starboard side of a narrow channel "when it is safe and practicable," applies as well to navigation in darkness or fog as in clear daylight, although the darkness or fog may affect the question of safety and practicability; and a vessel proceeding on the port side of a narrow channel in a fog, without any attempt to comply with the rule, must be held presumptively in fault for a resulting collision.

2. SAME—EXCESSIVE SPEED IN FOG.

Evidence held to show that the speed of a steamer libeled for collision in a fog was excessive under the circumstances.

3. SAME—NAVIGATION IN FOG.

When a vessel in a fog, proceeding properly in other respects, hears a whistle slightly on either bow, it is not clear that article 18, rule 1, of the navigation rules applies, and requires that the wheel should at once be put to port, as the whistle may be from a vessel going in any direction.

4. SAME—EXCESSIVE SPEED IN FOG.

It is the duty of a vessel to proceed in a fog at a moderate speed, both with respect to moving and to anchored vessels; and, generally speaking, her speed through the water, rather than over the ground, is the more important as it more closely affects her maneuvering power. This is especially true as regards danger to moving vessels, and that she was proceeding moderately over the ground will not free her from blame, if, proceeding immoderately through the water, she strikes a vessel under way.

5. SAME.

A steamer proceeding in a fog in a narrow channel, where there was danger of meeting other vessels, at a speed of over eight knots through the water, and at more than seven over the ground, was negligent, and must be held in fault for a collision in which she was injured, unless it is clearly shown that her excessive speed could not have contributed thereto.

In Admiralty. Suit for collision.

Nason & Proctor, Frederic Dodge, and Edward S. Dodge, for libelant.

Carver & Blodgett, for respondent.

LOWELL, District Judge. This was a suit brought to recover damages caused to the sidewheel harbor steamer Mayflower, plying between Boston and Nantasket, by a collision in Boston Harbor with the iron screw steamship Yarmouth, plying between Boston and Yarmouth, Nova Scotia. The collision occurred August 22, 1899. At the place of collision there was a thick fog. In some other parts of the harbor there was little more than a haze. The weather was otherwise pleasant; the wind very light from the eastward; the hour between 2:25 and 2:40 p. m.; the tide about half ebb. The Mayflower had left Pemberton on her way to Boston. Nine minutes after pass-

ing Nix Mate she passed on her port hand the steamship Sagamore lying at anchor. Very soon after, the Yarmouth seemed to emerge from the fog. The Mayflower's engines were at once reversed, and her helm put to port; but the bow of the Yarmouth entered her port side about 40 feet from the stem, cutting in nearly to the pilot house. Almost immediately the vessels separated. The shock was slight to both vessels,—not enough to upset the passengers or disturb the position of the furniture. The Yarmouth had left her wharf to proceed upon her voyage. She entered the fog near the gas buoy on the Upper Middle, which she passed not far away. Later she passed buoy No. 8 close upon her port hand. She heard several fog blasts, which those aboard her subsequently supposed to have come from the Mayflower. On hearing the last and nearest, her engines were immediately reversed full speed at almost the exact moment when the Mayflower was first perceived, bearing a little on her starboard bow. The helm of the Yarmouth was put to port, but the collision occurred as above described. The libel of the Mayflower alleges faults on the part of the Yarmouth as follows:

1. Failure to observe article 25 of the new inland rules, by the Yarmouth's keeping wholly upon the port side of the channel, instead of upon the starboard side, as required by the article. President Roads and its approaches are, I think, a "narrow channel," within the meaning of the rules. The claimant contends that article 25 is not intended to apply in a fog, but only where objects can easily be distinguished for a considerable distance. He urges that a compliance with the rule is practically impossible in a fog, because then the position of a vessel cannot be known at every moment with entire accuracy, but she is compelled to take the best course she can, irrespective of the imaginary line of the "mid channel." The article requires steam vessels to keep on the starboard side of a narrow channel "when it is safe and practicable." Doubtless it may occasionally be unsafe and may often be impracticable to keep with accuracy on the starboard side of a narrow channel in a thick fog or in thick darkness, and so a deviation from the starboard side which would be blameworthy in open daylight may be excusable in fog or darkness, but the article is not to be limited strictly to clear daylight. So far as is safe and practicable under all the circumstances, a steam vessel must always keep herself on the starboard side of "a narrow channel." Steamship Co. v. Smith, 20 C. C. A. 419, 74 Fed. 261; The Vanderbilt, 6 Wall. 225, 229, 18 L. Ed. 823. In this case not only was the Yarmouth's course far upon the port side of the channel, but she made not the slightest effort to avoid that course. A reporter who talked with her captain two days after the collision testified that the captain informed him that he had tried to keep on the starboard side of the channel; but the captain made no such statement in his evidence, and I am forced to conclude either that the reporter misunderstood the captain, or that the captain's statement was incorrect when made. There was nothing in the circumstances of the case or in the situation to exonerate the Yarmouth from attempting to comply with the literal meaning of the article, and, as no attempt was made, I must find her at fault for disobeying the rule.

2. Excessive speed in a fog: According to the testimony from the Yarmouth, she had been proceeding for some time before the accident at a rate of speed never greater than that produced by from 25 to 30 revolutions of her engines per minute,—a rate of speed designated by her captain and engineer as "slow." The engines had often been stopped, and some of those on the Yarmouth testified that they had once been reversed half speed astern for a few moments. According to the statements of most of those on the Yarmouth, her rate of speed through the water shortly before the accident was not more than from 2 to 4 knots an hour; the whistle of the Mayflower was heard just before she was seen apparently to emerge from the fog; the Yarmouth gave three whistles, and her engines were reversed full speed astern. In the opinion of her captain and others on board of her, this action was causing her to move slowly astern through the water at the moment of collision. I find myself compelled to doubt the accuracy of much of this testimony. That the Yarmouth was being navigated at a speed and with a care not uncommon among steam vessels in a fog may be admitted. The reported cases contain ample proof that this customary speed is often, if not usually, too high. See The Columbian (D. C.) 91 Fed. 801, and cases there cited. The times taken by the Yarmouth in passing from point to point in her course, viz. from the gas buoy near the Upper Middle to the place of collision, from the gas buoy to buoy No. 8, from buoy No. 8 to the place of collision, while none of these times can be established accurately, yet, upon the whole, indicate that her rate of speed when proceeding under the "slow" signal was much more than 3 or 4 knots,—probably at least 6. That the speed had been considerably reduced before the collision occurred is not doubted, but I cannot believe that the Yarmouth was either stationary in the water or moving astern at that time. Much expert testimony was offered concerning the inference which should be drawn from the effect of the blow and the size of the wound inflicted upon the Mayflower. The experts on both sides were intelligent and honest, but Constructor Baxter, upon whom the claimant relied, admitted that he had never seen a wound like the Mayflower's produced in a vessel which had collided with a stationary or retreating object. He testified that, in his opinion, the Yarmouth was going astern $\frac{1}{2}$ to $1\frac{1}{2}$ knots, and the Mayflower going ahead 2 to 4. I cannot believe that the Mayflower, thus striking a retreating vessel, could impale herself so deeply upon it. On the contrary, I find that at the time of the collision the Yarmouth was proceeding through the water at a rate which cannot be stated accurately,—from 2 to 4 knots,— and that at the time her engines were reversed her rate of speed was excessive, considering the place of the accident. This opinion is strengthened by the fact that the Yarmouth heard several whistles on an approaching vessel, nearly ahead, and did not act upon them in any way until the last blast was heard,—whether immediately before or immediately after the Mayflower appeared, is hard to say.

3. Failure to maintain a proper and sufficient lookout: The Yarmouth had two seamen stationed close to her stem,—one on the starboard and one on the port side. Twenty feet astern of them,

halfway between them and the pilot house, the first officer was sta-
tioned, with no duty except to look out, and to pass to the pilot
house the report made by the seamen. There were other seamen
near the stem, not particularly occupied, and the second officer was
heaving the lead from the starboard side of the vessel. The quar-
termaster was at the wheel, the captain on the starboard side of the
pilot house, the pilot upon the port side. Excluding the second
officer and the seamen not especially on the lookout, there was am-
ple provision in every respect; and upon this head I find the Yar-
mouth free from blame.

4. Failure to sound a proper and sufficient fog whistle: That the
fog whistle of the Yarmouth was regularly blown is testified to by
all on board,—crew and passengers alike,—and I have no doubt
that this was done. It has been urged that there is evidence to
show that the fog whistle was insufficient, but this seems to me so
unlikely, and the evidence in support of the contention so weak,
that, although the whistle may not have been specifically distin-
guished, either by those on the Mayflower or by those on the an-
chored steamer Sagamore, until the three whistles were blown
upon it, yet I am unable to find the Yarmouth to blame in this re-
spect. Not improbably, the Mayflower's mate did hear the Yar-
mouth's whistle some time before the latter appeared, but did not
report it.

5. Failure to keep clear of the Mayflower, and to pass her port to
port: I doubt if article 18, rule 1, applies in this case. When a
vessel in a fog, proceeding properly in other respects, hears a whis-
tle slightly on either bow, it is not clear that the wheel should at
once be put to port, as the whistle may proceed from a vessel going
in any direction. So far as the fault charged in this head differs
from that charged in the second head, I am inclined to think that
the Yarmouth is not to blame, and she was not to blame for giving
a reversing instead of a passing signal at the last moment.

Having thus found the Yarmouth at fault for the collision, it re-
mains to consider if the fault of the Mayflower contributed thereto.
The only fault stated in the answer, and that principally urged in
the argument, is excessive speed. According to the testimony of
those on the Mayflower, she was proceeding at what was designated
by her captain and pilot as "half speed." Various estimates of this
speed were given by those on board her, and by other persons who
were familiar with her movements; but it is unnecessary to consider
these estimates, or those made from the Yarmouth and the Sagamore,
because there is testimony establishing with sufficient accuracy what
was her rate of speed on the day of the collision, and barely a minute
before it. She was 9 minutes, precisely, in traversing the distance be-
tween Nix Mate bell buoy and the steamer Sagamore. The position of
the Sagamore is determined by an observation made by those on board
of her in the late afternoon of the same day. The Sagamore was then
swinging to a flood tide, and the position of her bridge had been
brought by the change of tide about 750 feet further from Nix Mate
than at the time of the collision. Making allowance for this swing,
the Sagamore lay at the time of the collision fully $1\frac{1}{3}$ miles from Nix

Mate buoy. This distance, as has been said, was covered by the May-flower in 9 minutes; that is, at a rate of speed over the ground of 7½ knots. It is impossible to determine accurately the strength of the tide which was running against the Mayflower. Between Long Island light and Deer Island light it was about 3 knots. By the Sagamore it may not have been running over 1¼ knots, though probably it was a little stronger. Its average strength over the course traversed by the Mayflower in these 9 minutes cannot have been less than 1½ knots, and was probably nearer 2 knots. This would make the speed of the Mayflower through the water from 9 to 9½ knots. So di-rect and conclusive is this evidence of the Mayflower's speed, that to discuss the various estimates of it would be altogether unprofitable. The calculation thus made is confirmed by the fact that the or-dinary running time of the Mayflower under half speed from Nix Mate bell buoy to buoy No. 8, a distance of about 2.425 knots, was 18 minutes, indicating a speed of something over 8 knots. Again, on the day in question the distance from Pemberton to Nix Mate bell buoy had been covered in 10 minutes and a half, at a rate of speed exceeding 12 knots. According to the engineer, full speed was not kept up over 6 minutes. If full speed be taken at 14 knots, half speed was not much less than 10. Upon the whole, therefore, the half speed of the Mayflower through the water was decidedly more than 8 knots. Her speed over the ground was more than 7 knots. It was ingeniously contended by counsel for the libelant that the test of a steamer's speed in a fog is her speed over the ground, and not her speed through the water. The true rule is stated by Mars. Mar. Coll. p. 436:

"As regards danger to vessels at anchor, the speed of the other ship over the ground, and not through the water, is that which must be considered, and in such cases the strength and direction of the tide must be taken into account. As regards danger to vessels under way, the tide is immaterial."

That is to say, it is the duty of a vessel to proceed in a fog at a moderate speed, both with respect to moving and to anchored ves-sels. That she is proceeding at a moderate rate of speed over the ground will not free her from blame, if, proceeding immoderately through the water, she strikes a vessel under way. That she is proceeding moderately through the water will not excuse her, if, proceeding immoderately over the ground, she strikes a vessel prop-erly anchored. Speaking generally, speed through the water is the more important consideration. This affects more closely her ma-neuvering power, and under ordinary circumstances is more easily de-termined than the rate over the ground. In the case of a steam vessel, the former can be known with considerable accuracy by counting the revolutions of the engine or by the log; the lat-ter often known only by an allowance for the tide, which cannot easily be made. The object of requiring a vessel to proceed slowly in a fog is to enable her to avoid other objects. These objects to be avoided are oftener moving than stationary, and, as a rule, stationary objects are more easily avoided. Extreme cases of very swift tide can be put, in which the ordinary requirement con-cerning speed must be modified, and this is to be expected; for the

rules are not rigid, and do not impose upon vessels a duty to proceed at the same rate under all circumstances. Upon the whole, however, the general application of the rule requiring a vessel to proceed at moderate speed in a fog is much more commonly applicable to her speed through the water than to her speed over the ground. It would be strange if, in a collision in the Gulf Stream, where the current is considerable, and easily and accurately determinable, an allowance should be required for this current in case of a fog. No case has been found by counsel or by the court in which a speed of 8 or 9 knots an hour through a dense fog in a crowded harbor, where, as was testified by the captain of the Sagamore, the air seemed filled with fog signals, has been held a safe and proper rate. Even if the speed made over the ground (say, $7\frac{1}{2}$ knots) were taken as the Mayflower's rate of speed, the same result would be reached. "While it is possible that a speed of six miles an hour, even in a dense fog, may not be excessive upon the open ocean and off the frequented paths of commerce, a different rule applies to a steamer just emerging from the harbor of the largest port on the Atlantic Coast." The Martello, 153 U. S. 64, 70, 14 Sup. Ct. 723, 38 L. Ed. 637.

It was urged with great force that the Mayflower was able to stop in not less than her own length when proceeding at this speed, and, hence, as the Yarmouth was recognizable $1\frac{1}{2}$ or 2 lengths away, that the Mayflower had complied with the rule. Some of this testimony was of weight, but I am not satisfied that the Mayflower was stopped at the time of the collision. Doubtless her rate of speed was low, and also that of the Yarmouth,—a fact proved by the slightness of the shock, as testified to by all on both vessels. The rapidity with which the two vessels separated proves that the engines of both were reversed at the time of collision; but I rather think that the Mayflower was then proceeding ahead at a low rate of speed,—say, 2 or 3 knots an hour; probably not quite so fast as the Yarmouth, though this is not clear. Immediately before the collision the Mayflower was proceeding at a rate of speed never held to be allowable in like case, and, if this be so, she certainly cannot be permitted to maintain her faultlessness unless she shows clearly that this rate of speed, apparently excessive, could not have contributed in any way to the collision. I do not think that this has been established. Indeed, the evidence indicates to me that her excessive rate of speed did contribute to the collision, and I find her to blame in this respect. Again, the mate of the Mayflower, who was on the lookout, heard a whistle ahead of him a little while before the collision. It is not certain that this came from the Yarmouth. Probably it did, and, in any case, to continue at an 8 or 9 knot speed after hearing it, was in flagrant defiance of the rules. See article 16. It is immaterial whether the captain heard the whistle or not. If the mate failed to report it, the captain's failure to hear it does not excuse the vessel. That those on the Sagamore did not hear it, or did not distinguish it among the many other blasts heard, proves nothing. The result is that both vessels contributed to the collision, and there must be a decree for the libelant for half the damage sustained.