## THE ALFRED W. BOOTH.

### THE BEE.

#### (District Court, S. D. New York. June 30, 1903.)

1. COLLISION—TUGS WITH TOWS MEETING—NEGLIGENT NAVIGATION OF TUG.

    Where two meeting tugs, each having two scows in tow tandem, each ported and continued bearing off to starboard until they were opposite each other, at a distance apart of 250 to 300 feet, when one, whose rear tow was about 230 fathoms behind, straightened out on her former course, she was in fault for a collision between such rear tow and one of those of the other tug, it being her duty, owing to her long hawsers, to continue her starboard course until the tows had safely passed.

2. SAME—NAVIGATION OF CHANNELS—VIOLATION OF RULES.

    Article 25 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2883]), which provides that "in narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel," applies to navigation in the Upper Bay of New York, between Bay Ridge and Tompkinsville, where, owing to the anchorage grounds on either side, the fairway or channel between, safely navigable for tugs with tows, is only about half a mile wide; and a tug with tows passing down on the left-hand side, when it was safe and practicable to keep to the other side, is in fault for a collision between one of her tows and that of an incoming tug, although her navigation was in other respects without fault.

In Admiralty. Suits for collision.

James J. Macklin, for libelants New York Contracting & Trucking Co. and others.

Benedict & Benedict, for claimant of the Bee and libelant R. G. Packard Co.

Wing, Putnam & Burlingham, for claimant of the Booth.

HOLT, District Judge. These are two libels to recover damages for a collision between the scow Delaware and scow No. 20. One libel was filed by the owners of the scow Delaware against the steamtugs the Alfred W. Booth and the Bee, and the other by the owner of the Scow No. 20 against the Alfred W. Booth. The collision occurred off Bay Ridge, in the Upper Bay of New York, on September 7, 1902, about 1:30 a. m. The tug Alfred W. Booth was coming in from sea, having in tow two scows, tandem—the first one on a hawser of about 150 fathoms, and the second one, the Delaware, astern of the first scow on another hawser of about 80 fathoms. The tug Bee was coming down the bay, having in tow two scows (one of them No. 20), also tandem, but close together, on a hawser of about 200 fathoms. Each of the tugs, when they were about half a mile apart, saw the red light of the other, and each sounded one whistle to the other, indicating an intention to pass port to port. The Bee immediately ported, and changed her course about four points to starboard, and held that course unchanged until the collision. The Booth also ported two or three points, and when about abreast of the Bee straightened, and resumed her course up the bay. The tugs passed each other in safety, but the Delaware, at the end of the Booth's tow, came in collision with

the Scow No. 20, the head boat in the Bee's tow. The Scow No. 20 was badly injured, and the scow Delaware shortly after sank.

In my opinion, the Booth was at fault for not continuing to bear off to starboard until the tows had entirely cleared each other. The witnesses put the distance of the tugs apart when they passed each other at about 250 or 300 feet. Each had been bearing several points to starboard of her original course for the last half mile. The evidence shows that such tows on such long hawsers do not usually follow instantly a change of course of the tug, but drift on some distance in the original direction, or with only a slight change of direction. There was danger, therefore, when the tugs passed each other but 250 feet apart, that the scows might drift together, and the Booth should have anticipated that danger, and kept bearing off to starboard until it was certain that the scows would pass each other in safety.

I do not see that the Bee was in any fault in the manner of her navigation. Her pilot changed his course, as soon as he saw the Booth, about four points to starboard, and kept that course till the collision. The serious question in respect to the liability of the Bee is whether she was in fault for being on the wrong side of the channel, in violation of rule 25 (Act June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2883]). This rule provides that "in narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel." The Bee was not on the side of the fairway which lay on her starboard side, but was on the east side of the channel. She was in the body of water commonly called the "Upper Bay of New York," which, where the collision happened, between Bay Ridge and Tompkinsville, is nearly two miles in width. This body of water is undoubtedly a channel. It is the channel of the Hudson river, and the channel for all ships passing between New York Harbor and the sea. Moreover, there are anchorage grounds on each side of the Upper Bay, and the fairway at the place of the collision, according to the chart, is only about half a mile wide. Rule 25 was not made applicable to inland waters by statute until 1897. It had existed for some time previously in England, and is included in the Rules for Ocean Navigation adopted in 1885, and in the International Rules, which went into effect in 1896. Before it was made a rule by statute, it was a well-known rule of navigation on rivers in foggy weather, and recognized as such by the courts. The Vanderbilt, 6 Wall. 225, 18 L. Ed. 823. It seems to have been uniformly applied to rivers. It has been held applicable to the Elizabeth river, Va. (The Victory, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519); the Delaware river (The Maling [D. C.] 110 Fed. 228); the Potomac (The Newport News, 105 Fed. 389, 44 C. C. A. 541); the Providence river (The Berkshire, 74 Fed. 906, 21 C. C. A. 169); the Danube (The Spearman, 10 App. Cas. 276); the Whang Poo, in China (The Pekin [1897] App. Cas. 532). No case has been called to my attention in which it has been held that any river, however wide, is not governed by the rule. It has also been held applicable to other channels, such as the Cardiff Drain (The Leverington, 11 Prob. Div. 117); the President Roads, in Boston Harbor (The Yarmouth [D. C.] 100 Fed. 667); the entrance to the port of Baltimore (The

Acilia [D. C.] 108 Fed. 975); the Lower Bay of New York, at a point where the deep ship channel is at least 2,000 feet wide, and on the side of which was considerable further space for vessels of ordinary draft (The Sea King, 114 Fed. 535, 52 C. C. A. 349); the entrance to San Francisco Harbor, commonly called the "Golden Gate," nearly a mile wide (Occidental Co. v. Smith, 74 Fed. 261, 20 C. C. A. 419); the Straits of Messina, which are stated in Lippincott's Gazetteer to have a general width of eleven miles, but that where they are narrowest they do not exceed two miles (The Rhondda, 8 App. Cas. 549). There are, of course, many instances in which adherence to the rule might not be safe or practicable, and the rule itself excepts such cases from its operation. In navigation immediately about harbors the rule would often be impracticable (Hughes on Adm. § 136), and there may be strong currents or peculiar movements of the tide in particular places making the rule inapplicable. Particular local statutes or rules also may exist, which, by the provisions of rule 30 of the International Rules (Act Aug. 19, 1890, c. 802, 26 Stat. 328 [U. S. Comp. St. 1901, p. 2871]), may supersede the provisions of rule 25. But in any channel narrow enough to involve any danger of collision the statute makes the rule applicable to vessels passing through it, whenever it is safe and practicable for them to keep on the right-hand side. There was evidence in this case that it was the custom of tugs with long tows to pass to the east of the main channel in order to keep out of the way of large steamers traversing the main channel, but, of course, no custom can justify a violation of a United States statute. Occidental Co. v. Smith, 74 Fed. 261, 20 C. C. A. 419. It is obvious that, if the rule had been obeyed in this case, no collision would have happened. It was perfectly safe and practicable for the Bee, in taking her tow through the Upper Bay, to keep to the right-hand side of the fairway, and I think under the decisions that she was in fault for not doing so.

My conclusion is that both the Booth and the Bee were in fault for the collision, and that the damages should be divided between them. It may be claimed that the accident would not have happened if the Bee had not violated rule 25, and that, therefore, the Bee should be held exclusively responsible. It is true that the collision would not have occurred if the Bee had kept on the west side of the channel, but the fact that a vessel is violating one rule of navigation does not justify another vessel in violating another rule and running her down.

The libelants the New York Contracting & Trucking Company et al. are therefore entitled to a decree against each steam tug for half the damages sustained by the scow Delaware. As the owners of the Scow No. 20 are also the owners of the Bee, they do not ask for a decree against the Bee. They are entitled to a decree against the Booth for half the damages suffered by Scow No. 20. There should be the usual reference to ascertain the amount of damage.

### Memorandum on Rehearing.

#### (January 8, 1904.)

This is a rehearing of the above case, under an order permitting the case to be reopened and new evidence taken. Some misunderstanding

seems to have arisen as to the meaning of certain expressions in my former opinion. In that opinion I stated that "there are anchorage grounds on each side of the Upper Bay, and the fairway at the place of the collision, according to the chart, is only about half a mile wide." The term "fairway," as here used, is perhaps not entirely accurate. I meant by it the water between the western side of the eastern anchorage ground and the eastern side of the western anchorage ground. Of course, if no vessels are at anchor in an anchorage ground, there is no objection to steam vessels crossing it, but a steam vessel which goes upon an anchorage ground, and comes in collision with a vessel at anchor, is presumably in fault, and therefore it seemed to me proper to designate the waters in which a vessel, under all circumstances, can go without any risk, as the fairway. The opinion also stated that the body of water where the collision happened, between Bay Ridge and Tompkinsville, is nearly two miles in width, and that this body of water is undoubtedly a channel. There are two main channels in the Upper Bay for vessels of deep draft—one the main ship channel on the west side, and the other the Bay Ridge channel on the east side. The water between these two deep channels is more shallow, but is of ample depth for the purposes of ordinary tugs and tows. I therefore consider that for the purposes of this case all that portion of the Upper Bay which can be safely navigated by tugs with tows going to or returning from sea is, as to them, a channel. But as on each side of this body of water there are anchorage grounds, and as tugs with tows are subject to the same presumption of fault as other steam vessels if they cross the anchorage grounds and come in collision with a vessel there at anchor, the portion of such channel which tugs with tows can safely navigate when vessels are anchored there is much less than the entire width of the Upper Bay. I have no doubt that for vessels of deep draft the two deep channels on the east and west sides of the Upper Bay are narrow channels. Whether the entire Upper Bay is to be regarded as a narrow channel for vessels of light draft is less obvious, but, in my opinion, under the authorities, it is a sufficiently narrow channel to make rule 25 operative. The question, therefore, is whether it is ordinarily unsafe and impracticable to obey this rule in that place. The evidence shows that a large number of the captains and pilots navigating steam vessels in the Upper Bay do not obey the rule, and probably have not supposed that it applies. In any particular instance, of course, it may be unsafe or impracticable to comply with the rule, but the evidence does not satisfy me that it is so universally unsafe and impracticable to comply with the rule that it has no application there. The principal point made in the evidence is that tugs and tows habitually start on their trip to sea at the beginning of the ebb tide, so as to get the advantage of the current; that the set of the ebb tide in the Upper Bay is towards the southwest, and that, if they go down the west side of the bay, there is danger that they will drift over upon vessels at anchor in the western anchorage ground. It is also urged that all steamers coming into the port have to stop on the west side of the bay, at the quarantine station, and that a large number of them come to anchor on the western anchorage ground. This may be a reason why tugs with tows should not go as far over

as the extreme west side of the main ship channel for vessels of deep draft, but I see no reason why they cannot keep to the right of the center line of the bay, and still be safe.

The simple explanation of the reason, as given by the witnesses, why tugs with tows go down on the east side of the bay, appears to be that it is the straighter course, and they can make the trip in that way a little quicker. Moreover, the principal danger appears to be in the case of tows on very long hawsers, which are notoriously difficult to manage. The evidence shows that such long hawsers are used in order to place the tows out of the reach of the back wash from the tugs, and to enable a little faster speed to be made. It is perfectly practicable to take out tows with shorter hawsers, and, if the enforcement of the rule were to make that the custom, a danger in the navigation of the harbor which has frequently been commented on in collision cases would be much lessened. I think, as a matter of fact, that if rule 25 is applicable to the Upper Bay, and enforced, it will tend to prevent collisions. But whether it will or not was for Congress to say. A statute has been enacted, and, of course, if it is applicable in any case it must be enforced. I appreciate that the question is doubtful, but from the best consideration which I have been able to give to the case I think that rule 25 applies, that the decision originally reached in this case was correct, and that nothing contained in the evidence taken on the rehearing affords a sufficient reason for changing it.