THE DAUNTLESS.

UNION TRANSP. CO. v. KENT.

(Circuit Court of Appeals, Ninth Circuit. February 1, 1904.)

Nos. 952, 953.

1. MARITIME LIENS—WRONGFUL DEATH—STATUTORY ACTION FOR DAMAGES.
Code Civ. Proc. Cal. § 377, gives a right of action for wrongful death "against the person causing the death." Section 813 provides that "all steamers, vessels and boats are liable * * * (5) for injuries committed by them to persons or property." *Held*, that such statutes do not give a

---

¶ 1. Maritime liens for torts, see note to The Anaces, 34 C. C. A. 565.
See Admiralty, vol. 1, Cent. Dig. § 285.

lien on a vessel for the damages recoverable under section 377 for a death resulting from collision, and that a suit in rem cannot be maintained in a court of admiralty to recover such damages.

2. EVIDENCE—WEIGHT—RIGHT TO DISBELIEVE WITNESS ALTHOUGH UNCONTRADICTED.

In a suit to recover for the death of a person on a launch which was sunk in collision with a steamer, where the only persons on the launch were drowned, the court is not bound to accept as true the testimony of the pilot of the steamer that the launch suddenly changed its course and ran directly into the steamer, although uncontradicted, the inherent improbability of such action being such as to warrant the court in disbelieving the testimony.

3. COLLISION—STEAMERS MEETING IN NARROW CHANNEL—VIOLATION OF RULES.

A steamer held in fault for a collision in a river with two launches made fast together, in which the launches were sunk, and those on board drowned, on the ground that she did not have a proper lookout, and for violation of article 25 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), which required her to keep on the other side of the channel.

Appeals from the District Court of the United States for the Northern District of California.

For opinion below, see 121 Fed. 420.

Nathan H. Frank and Campbell, Metson & Campbell, for appellants.

M. B. Woodworth and F. R. Wall, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. Separate appeals were taken in these cases. They were consolidated for trial, and have been argued together in this court. The testimony was all taken before a commissioner. No. 952 is an action in rem brought by the administrator of John T. Doane, deceased, against the steamer Dauntless for damages occasioned by the death of John T. Doane. No. 953 is an action in personam brought by the administrator of David J. Kent, deceased, against the Union Transportation Company for damages occasioned by the death of David J. Kent. Both causes arise out of the same state of facts. Appellee in each case recovered the same amount of damages, to wit, $1,200.

There are only 177 assignments of error in each case. Why counsel should have taken pains to make so many assignments is unexplained. The truth is that there were but three points discussed by counsel, and we shall confine ourselves to these points.

1. There is one point raised which relates exclusively to case No. 952, viz., it is claimed that this case is an action in rem, and that no lien is given under the laws of the state of California, enforceable in an action for damages by death.

This court, in The Willamette, 70 Fed. 874, 878, 18 C. C. A. 366, 31 L. R. A. 715, and in Laidlaw v. Oregon Ry. & Nav. Co., 81 Fed. 876, 879, 26 C. C. A. 665, in construing the statute of Oregon which reads as follows: "Every boat or vessel used in navigating the waters of this state * * * shall be liable and subject to a lien * * * for all * * * damages or injuries done to persons or property by such boat or vessel" (Hill's Ann. Code, § 3690)—held that an action

of this character in rem could be sustained. The question involved in this case is whether or not such actions can be maintained under the statutes of California. It is claimed that the question has been decided in favor of appellants' contention by the Supreme Court of California (Munro v. Dredging Co., 84 Cal. 515, 524, 24 Pac. 303, 18 Am. St. Rep. 248; Morgan v. Southern Pacific Co., 95 Cal. 510, 519, 30 Pac. 603, 17 L. R. A. 71, 29 Am. St. Rep. 143), and by the Supreme Court of the United States (The Albert Dumois, 177 U. S. 240, 257, 20 Sup. Ct. 595, 44 L. Ed. 751), and by the Circuit Court of Appeals, Seventh Circuit (The Onoko, 107 Fed. 984, 986, 47 C. C. A. 111).

These suggestions require an investigation upon new lines. In the construction of state statutes, it is our duty to follow the decisions of the Supreme Court of a state. If no construction has been given to the statute by that tribunal, but has been given by the Supreme Court of the United States, we would be controlled by such decision. The decisions in other circuits are not binding upon this court, but are deserving of respect, and entitled to credit and consideration for the strength of the reasons therein given.

The statute of California (section 377, Code Civ. Proc.) provides, "When the death of a person is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death." Section 813, Code Civ. Proc., provides, "All steamers, vessels, and boats are liable * * * (5) for injuries committed by them to persons or property."

The California cases above cited did not discuss the questions here presented. All that was there said having any bearing upon the statute was "that the action given by the statute is a new action, and not the transfer to the representative of the right of action which the deceased person would have had if he had survived the injury."

In The Albert Dumois Case, the court said:

"Assuming for the present that the question of lien is material, we are next to inquire whether such lien is given by the local law of Louisiana. We are cited in this connection to two articles of the Civil Code, the first of which (article 2315), as amended in 1884, declares that 'every act whatever, of man, that causes damage to another, obliges him by whose fault it happened to repair it; the right of this action shall survive, in case of death, in favor of the minor children or widow of the deceased, or either of them, and in default of these, in favor of the surviving father and mother, or either of them, for the space of one year from the death. The survivors above mentioned may also recover the damages sustained by them by the death of the parent, or child, or husband, or wife, as the case may be.' It was held by us in The Corsair, 145 U. S. 335 [12 Sup. Ct. 949, 36 L. Ed. 727], a case arising out of a collision which also took place on the lower Mississippi, that this local law did not give a lien or privilege upon the vessel, and that nothing more was contemplated by it than an ordinary action according to the course of the law as administered in Louisiana. Our attention is also called by the owners of the Dumois to subdivision 12 of article 3237 of the Civil Code, which reads as follows: 'Where any loss or damage has been caused to the person or property of any individual by any carelessness, neglect or want of skill in the direction or management of any steamboat, barge, flatboat, water craft, or raft, the party injured shall have a privilege to rank after the privileges above specified.' No reliance was placed upon this article in the case of The Corsair, probably because it was thought to refer only to losses or damages to persons still living, and that an action would lie in favor of the party injured. Certainly, if this article had been supposed to give a remedy for damages occasioned by death, to the representatives of the deceased person,

it would never have escaped the attention of the astute counsel who participated in that case. The question whether 'damage done by any ship,' jurisdiction over which was given to the High Court of Admiralty in England, included actions brought by the personal representatives of seamen or passengers killed in a collision, has been the subject of many and conflicting judicial opinions in the English courts, a summary of which may be found in The Corsair, 145 U. S. 345 [12 Sup. Ct. 949, 36 L. Ed. 727], and was finally settled against the jurisdiction by the House of Lords in the case of The Franconia, 10 App. Cases, 59. * * * The object of article 3237 was not to extend the cases in which damages might be recovered to such as resulted in death, but merely to provide that, in cases of damages to person or property, where such damage was occasioned by negligence in the management of any water craft, the party injured should have a privilege or lien upon such craft. We deem it entirely clear that the article was not intended to apply to cases brought by the representatives of a deceased person for damages resulting in death."

In The Onoko the court said:

"Undoubtedly, in this country, since the decision in The Corsair, the general trend of opinion in the lower courts has been to the effect that the water-craft laws of the various states give a lien upon the vessel for injuries occasioning death. * * * In all these cases, with the exception of The Glendale, the act supposed to grant the lien is an independent act, and in no way connected with the act giving the action for the death. In The Glendale the provision granting the lien is part of the very act giving the right of action."

In referring to The Albert Dumois Case, the court states the fact upon which the case was decided, and gives the views of the court upon the question here under discussion. It was there, as here, urged that the declaration of the opinion upon the subject of the lien is dictum, because it was adjudged that, under the limited liability act, damages by reason of death were recoverable, although no lien upon the vessel was allowed, and the court said:

"We do not think this contention should prevail. The question was, as we read the opinion, whether a moiety of those damages should be charged upon the amount awarded to the owner of the Argo, upon the ground that the interveners had liens upon the Argo, and that, having such liens, the court was justified in deducting from the amount awarded to the owner of the Argo a moiety of the damages awarded to the interveners. We may not consider this declaration of the Supreme Court as merely dictum, but, if the matter were doubtful, we should not feel at liberty to disregard this carefully considered deliverance of the Supreme Court upon the subject."

The court then discussed the Lord Campbell act, and the statutes of the different states with reference thereto, and said:

"It is also to be said that the water-craft law contemplates a lien for direct injuries done by the inanimate thing negligently navigated, and would not seem to comprehend such injury as is contemplated by the act granting a right of action for a death. The injury for which a lien is given is a direct injury by the negligently navigated craft to person or property. By reason of the faulty navigation and consequent collision, no injury was done to the person of the libelant, or to the persons of those he represents. Nor was injury done to his or their property. They had no property right in the person of the deceased. The right of action arose only upon and because of his death. The recovery is allowed as compensation for the supposed support and education which they would have received had he survived. This right of action, arising only upon death, cannot, within the meaning of the water-craft law, be property which could be injured by an inanimate thing negligently navigated. In view of the ruling of the Supreme Court, we are not permitted to follow the decisions upon this question by the Circuit Courts of Appeals rendered before the decision in The Albert Dumois, and are con-

strained to hold that no lien upon the vessel is created by the acts considered for the cause declared in the libel."

We are of opinion that no substantial difference can be drawn between the statutes of the different states upon which The Albert Dumois and The Onoko were based, and the statutes under consideration. If any distinction exists, it must be conceded that the language of section 813 of the Code of Civil Procedure of California is stronger in favor of appellants' contention than the others; and, in the light of these opinions, and in view of the language used in the California statute, we feel compelled to hold that in the Doane Case this court has no jurisdiction. That case (No. 952) is reversed, and cause remanded, with instructions to dismiss the action.

The other case (No. 953) must be considered upon its merits.

The Union Transportation Company was the owner of the steamer Dauntless. Doane was on a launch also named "Dauntless," and was towing another launch called "Viola," and Kent was on this launch. The launches were lashed together side by side. Both Doane and Kent lost their lives, and but one other man was on the launches, and he, too, was drowned. The collision between the steamer and the launches which resulted in their death occurred about 11:10 o'clock p. m., September 14, 1900, on the Mokelumne river, about a mile and a half above Central Landing, on Bouldin Island. The steamer about 10:50 p. m. left Valentine's Landing, which is about seven miles above Central Landing. The night was clear and calm, with a light wind blowing. The steamer was traveling at a speed of from 8 to 12 miles an hour, and drew about 6½ feet of water. The river was about 800 feet wide. The testimony shows that, between 3 and 5 minutes before the collision, lights were first seen from the hurricane deck of the steamer Dauntless. At that time the launches were between one-half and three-quarters of a mile from the steamer, off her starboard bow. The courses of the steamer and the launches made an angle with each other of from 15 to 20 degrees. At the time the light or lights were first seen from the steamer, her pilot, McNeil, thought one of them was "a pale green light." The steamer did not alter her course or speed, or give any signal with her whistle, until within at least 300 feet of the launches. The pilot of the steamer then saw that there were two launches under way, and that a collision was imminent or inevitable. He then gave two whistles, and put his helm to starboard, but the steamer and the launches came together while the steamer was swinging to port; the steamer striking the launch Dauntless on that launch's port side, damaging that side, the only place where any damage was received. The launches went to the bottom at one. The point of contact on the steamer was somewhere between her bow and 25 or 30 feet forward of the gangway of the steamer's starboard side.

Patterson testified that he was bow watchman of the Dauntless, and "was supposed to be on the bow to look out"; that on the night of the collision he was performing other duties; that when the collision took place he "was about fifty feet from the bow," alongside of the boilers on the starboard side; that when he got out on the bow of the steamer he saw a green light on the launches, about 100 yards ahead, and the collision occurred in about 1½ minutes; that as he

went out on the bow of the steamer he heard one bell first, "to stop," followed by two bells, "to back full speed."

Pellett, who was at the outside of the pilot house, testified that he first saw a light about three-quarters of a mile ahead; that he asked the pilot what it was, and "he said he thought it might be a schooner anchored out there," and he thought this was about five minutes before the collision. "Q. About how long was it after you heard this signal of one bell to the engine room before the collision? A. It was so quick that I could not tell how quick it was. * * * I got kind of excited when I seen them coming and see that it could not be avoided, and I could not exactly tell what time."

Rideout testified that there was about 18 feet of water where the launches were sunk, and that about two weeks after the collision the launches were found "between 150 and 200 feet from the left-hand bank of the river, going down."

The court below, in reviewing the testimony, said:

"My conclusion from the evidence is that the steamer Dauntless was in fault in two particulars: First, she did not have a lookout stationed at her bow immediately preceding the collision; second, the steamer, in starboarding her helm, and attempting to pass the launches near the left-hand bank of the river, violated article 25 of the act of June 7, 1897, c. 4" (30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]).

And in referring to the testimony as to the cause of the collision, said:

"The evidence is not very satisfactory as to the precise manner in which the collision occurred, but I am unable to accept the statement of the pilot of the steamer that the launches came 'straight up in the middle of the river, almost, and, when it got just abreast of the steamer, whipped right around and headed straight for the Dauntless.' Although this is not contradicted by any witness, it appears to me to be so unreasonable that the court would not be warranted in finding that such was the fact."

These findings are assailed, and constitute the pivotal points made by appellant, whose contention is that the launches were wholly at fault, that the launches ran into the steamer, and that the steamer did not run into the launches.

If the testimony of McNeil must be taken as true, because uncontradicted, then appellant's contention is made out, but it seems so unreasonable that a man in the small launch would be guilty of such conduct, almost certain to produce instant death to him. It is not impossible that he might have done so, but it is highly improbable. It certainly does not seem natural. Self-preservation is said to be the first law of nature. The lips of Doane and Kent were sealed by death, and the court is thereby deprived of their version of the facts. We have the right, therefore, to look to the common experience of mankind in order to determine whether the statement of McNeil is reasonable or not.

In Thomas v. Railroad Co. (C. C.) 8 Fed. 729, 731, where plaintiff's intestate had been killed in a railroad accident, and the court had instructed the jury that the deceased was bound to that measure of care and prudence which would have been exercised by an intelligent and careful man under the same circumstances, Judge Wallace, in denying a motion for a new trial, said:

"Notwithstanding the testimony of the defendant's witnesses, the jury were at liberty to draw the inference that, owing to the obstructions, the deceased did not see the approaching train, and that, owing to the noise of the factory, he did not hear it. The absence of any fault upon the part of the deceased may be inferred from the circumstances, in connection with the ordinary habits, conduct, and motives of men. The natural instinct of self-preservation in the case of a sober and prudent man stands in the place of positive evidence."

See, also, Allen v. Willard, 57 Pa. 374, 379; Railroad Co. v. Rowan, 66 Pa. 393, 399; Johnson v. Railroad Co., 20 N. Y. 65, 69, 70, 75 Am. Dec. 375.

This court is not bound to accept the statement of any witness simply because his testimony is uncontradicted, nor even when corroborated by other witnesses, if the story they all tell bears the earmarks of inherent improbability and is unreasonable.

The rule in relation to this subject is well expressed by Mr. Justice Field in delivering the opinion of the court in Quock Ting v. United States, 140 U. S. 417, 420, 11 Sup. Ct. 733, 734, 35 L. Ed. 501, as follows:

"Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court, but that rule admits of many exceptions. There may be such an inherent improbability in the statement of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony."

This court has announced the same rule. Lee Sing Far v. United States, 94 Fed. 834, 838, 35 C. C. A. 327, and authorities there cited. See, also, Chandler v. Town of Attica (C. C.) 22 Fed. 625, 627, and authorities there cited; Tracey v. Town of Phelps (C. C.) 22 Fed. 634; McLean v. Clark (C. C.) 31 Fed. 501, 504; People v. Milner, 122 Cal. 171, 179, 54 Pac. 833; Anderson v. Liljengren, 50 Minn. 3, 52 N. W. 219.

In Blankman v. Vallejo, 15 Cal. 638, 645, the court said:

"We do not understand that the credulity of a court must necessarily correspond with the vigor and positiveness with which a witness swears. A court may reject the most positive testimony, though the witness be not discredited by direct testimony impeaching him or contradicting his statements. The inherent improbability of a statement may deny to it all claims to belief."

In Haney v. Baltimore Steam Packet Co., 23 How. 287, 291, 16 L. Ed. 562, which was a case in admiralty, where the question raised was very similar to the case in hand, the answer admitted the collision, and the result of it, and it also admitted that the schooner was seen at a distance of 2 or 3 miles; that the steamer was proceeding at a rate of 14 miles an hour, heading due north, and the schooner holding her course nearly due south; but it alleged as an excuse that, while the steamboat and schooner were meeting on parallel lines, the schooner suddenly changed her course and ran under the bows of the steamer. The court said: "This is the stereotyped excuse usually resorted to for the purpose of justifying a careless collision. It is always improbable and generally false."

In examining the testimony of McNeil, we find that he was managing the steamer Dauntless, and responsible for her proper steering.

129 F.—46

He was interested in establishing the fact that it was the launches, and not the steamer, that were at fault in causing the collision. He admits that he was mistaken as to the light he saw on the launches. He made no inquiry of others on the steamer, but proceeded downstream on the wrong assumption that the launches were "a schooner at anchor." It is fair to presume that if the lookout had been at his post of duty, on the lower deck, in the forward part of the steamer, he would not have been misled as to the color of the light on the launches; and, if a constant lookout had been maintained, he would undoubtedly have discovered that it was a white light, and that the launches were moving, instead of being anchored, as the pilot supposed, in time to have given the facts to the pilot so as to have avoided the collision.

In The Pilot Boy, 115 Fed. 873, 875, 53 C. C. A. 329, 331, the court said:

"It is the duty of every steamer navigating the thoroughfares of commerce to have a trustworthy lookout, besides the helmsman, and in case of collision the absence of such lookout is prima facie evidence that the collision was caused by the fault of the steamer. The Genesee Chief, 12 How. 443 [13 L. Ed. 1058]. When acting as the officer of the deck, and having charge of the navigation, the master of a steamer is not a proper lookout. The Ottawa, 3 Wall. 269 [18 L. Ed. 165]. Proper lookouts are persons other than officers of the deck or the helmsman, and they should be stationed on the forward part of the vessel. Elevated positions on a steamer, such as the hurricane deck, are not as favorable situations for the lookout as those on the forward deck near the stem."

See, also, Chamberlain v. Ward, 21 How. 548, 570, 16 L. Ed. 211; The Parkersburgh, 5 Blatchf. 247, Fed. Cas. No. 10,753; Heney v. Baltimore Steam Packet Co., supra; Wilder's S. S. Co. v. Low, 112 Fed. 161, 172, 50 C. C. A. 473; Occidental & O. S. S. Co. v. Smith, 74 Fed. 261, 268, 20 C. C. A. 419.

We are of opinion that the steamer Dauntless was at fault in not obeying article 25 of the rules of navigation when she first saw the light of the launches. This rule reads as follows:

"Art. 25. In narrow channels every steam-vessel shall, when it is safe and practicable, keep to that side of the fair-way or mid-channel which lies on the starboard side of such vessel."

It is true that this rule must be taken in connection with the others, when applicable. It is not an absolute rule. The circumstances and situation may change it.

Article 22 is relied upon by appellant. This rule is to the effect that "every vessel which is directed by these rules to keep out of the way of another vessel, shall, if the circumstances of the case admit, avoid crossing ahead of the other." But this rule does not benefit appellant. The steamer had no right to wait until it got so near the launches that it was impracticable to cross ahead of the launches. The launches were on the right side of the middle of the river, going up; and the steamer ought to have been on the right side of the middle of the river, coming down. The launches were where they had the right to be.

Upon the whole case, our opinion is that the steamer's fault was the cause of the collision. If proper care had been taken on board the steamer Dauntless after the launches' light was first seen, it would

seem almost impossible that a collision could have happened, with the launches moving at a rate of two miles an hour through the water, even if it should be conceded that the launches were in some respects at fault as to their lights, or were carelessly or injudiciously managed. There was no necessity for the steamer passing so near to the launches as to create the hazard. The Genesee Chief, 12 How. 443, 461–463, 13 L. Ed. 1058.

The decree of the district court in favor of appellee Kent, in No. 953, is affirmed, with costs.