---

## THE EDDA.

(Circuit Court of Appeals, First Circuit. October 21, 1909.)

### No. 806.

1. COLLISION (§ 49*) — STEAM AND SAILING VESSELS — SUITS FOR DAMAGES — RULES OF EVIDENCE.

The rule of evidence applied, in cases of collision between sailing vessels, where the evidence is conflicting, that it is more probable that one vessel fell off from her course than that the other changed her course many points, applies with less force to a collision between a sailing vessel and a steamer.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 55; Dec. Dig. § 49.*]

2. COLLISION (§ 49*)—STEAMER AND SAILING VESSEL MEETING—EVIDENCE CONSIDERED.

A decree of the trial court affirmed which found that a collision in Vineyard Sound, on a clear evening, between a schooner and a steamer meeting, was due solely to the fault of the schooner in deviating from her course to one across that of the steamer.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 55; Dec. Dig. § 49.*]

Appeal from the District Court of the United States for the District of Massachusetts.

Suit by the Coastwise Transportation Company, as owner of a schooner, against the steamship Edda, Christopher P. Meidell, claimant, for collision. Decree for respondent, and libelant appeals. Affirmed.

Edward F. Blodgett (Blodgett, Jones & Burnham, on the brief), for appellant.

Edward S. Dodge and Benjamin Thompson, for appellee.

Before COLT, PUTNAM, and LOWELL, Circuit Judges.

PUTNAM, Circuit Judge. This is a question of collision in Vineyard Sound between a steamer and a sailing vessel, in the evening, clear, but yet, of course, such as to compel each vessel to rely on the lights within range. The testimony from each is directly contradictory,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

both as to the courses and the lights, without any clear proof from either where the collision occurred. The only two established propositions are that the steamer was running in a westerly direction, leaving the gas buoy near the eastern end of Hedge Fence on her port, and that the sailing vessel changed her course at Nobska Light, and from there steered in an easterly direction. With reference to everything else, any determination of the courses pro or con would not assist the determination of the bearings of the lights of the two colliding vessels. Neither would a determination of the latter assist a determination of the former. In other words, the proofs from each vessel involve inevitably questions of both courses and lights. The determination, with any accuracy, of the place of collision, might enable us to work back to the determination of the other issues; but the place of collision we cannot fix with any certainty.

The ultimate question is whether the sailing vessel held her course or swung around some five to six points, bringing her into collision with the steamer at almost right angles, or whether the change of course was on the part of the steamer. It would clearly have been on the part of the steamer, if she had voluntarily headed towards Squash Meadow, where she finally sunk; but her testimony is that she was brought up on Squash Meadow some time after the collision by the action of the wind and the currents. The parties have not solved the case, but have simply arrayed witnesses against each other. We find some circumstances which discredit the case of the steamer, and we find other circumstances, to some of which we will refer, which strengthen it, and the conclusion in her favor reached by the District Court.

The schooner urges anew on us, with persistency, the proposition that it is exceedingly improbable that she should have swung off from her course so many points as are involved in the claim that she was in fault. She calls our attention to the fact that we have several times observed on this, especially in The Metamora, 144 Fed. 936, 940, 75 C. C. A. 576, decided February 21, 1906. It is true we agree that, as between two sailing vessels, it is much more probable that one of them will fall off from her course than that the other will swing many points therefrom. Nevertheless, this is only one element, and it applies with less force to a collision between a steamer and a sailing vessel. In the case of a steamer there is no question of falling off; and the inherent improbability to be applied to the present case is quite as great with the one as with the other. We see nothing of this character sufficient to guide us safely between the parties here.

It is also claimed by the schooner that she was sailing with her booms well off on the starboard side, and that, if she had changed her course to starboard, as claimed by the steamer, her sails would have been taken aback and jibed over. They did jibe over, but whether before or after the collision cannot be ascertained from this record with any degree of certainty.

The counsel for the schooner also comment on the lack of qualification and the youth of the steamer's lookout, and call attention to the fact that he admits that he did not know the points of the compass.

The opposing counsel, as well as the learned judge of the District Court, commented on, and criticised as effectively, the schooner's lookout; and the 'criticism made of the latter might have been even more vigorous than it was. This lookout says that, when the steamer "made a dash across," he saw the red light, but that he did not see it until then. Yet the theory of the schooner was red to red all the time until the steamer made her alleged change of course. Probably, if the case of either vessel depended on the qualifications of the lookout, one would neutralize the other.

The schooner relies especially on a drawing made on a United States chart of the locality in question, from which she maintains that the courses claimed by the steamer were impossible. If these had been laid down by an expert, they might have given us some light; but a rule of thumb drawing like this is of no value in a case where a dispute about courses involves margins so narrow as those here.

Her counsel also comment on the proposition that the steamer was not navigating on the starboard side of the channel. Neither what is the channel, nor the relations thereto of either vessel, is sufficiently established to enable us to apply this proposition with any satisfaction.

Also, as to a claim that the steamer was at fault for attempting to cross the bow of the schooner, this is merely begging the whole case. If, on the other hand, the claim had been made in a suitable manner in the District Court that under the twenty-third article, or under the twenty-ninth article, the steamer, when, as she says, she saw the schooner swinging, should have slackened her speed, or stopped, or reversed, it may be that we would have held that the collision could thus have been avoided. We might, therefore, have held that there was mutual fault. But no such proposition is before us, or can arise on the record as made in the Circuit Court, or under the assignment of errors filed in connection with taking this appeal.

On the other hand, we think that the testimony of Capt. Cooper referred to by the District Court essentially determines the case in favor of the steamer. He was a skilled mariner, and on the night of the collision was second officer of the towboat Carlisle. The position of the Carlisle requires some explanation. A tow of three barges was heading easterly on the southerly side of the channel. The schooner was sailing easterly on a course parallel, or approximately so, to that of this tow. The Edda was, as she claims, heading westerly on a course which took her between the tow on the south and the schooner on the north. The Carlisle was heading easterly through the lane between the tow of three barges on her starboard and the steamer on her port. Cooper was on the watch at the window of her pilot house using his glasses. He was the only witness who had a correct perspective. In other words, he was like one who, at one end of a piece of highway, looks down through the center of the highway, and can thus arrange the order of what is approaching thereon. His testimony is clear and unshaken upon two points, either of which is important, and one of which is quite determinative. He saw the Edda coming down, contrary to the theory of the schooner, between the schooner on her starboard and the tow on her port, and he saw the

schooner swing on her course, with the collision immediately following. In view of what we have stated, aside from the testimony of Cooper, it would be impossible for us to satisfy ourselves that we could reach a conclusion which would approve itself to us better than that of the learned District Judge; and, with the testimony of Cooper, we feel that the burden preponderates in favor of the steamer.

The schooner appealed against a determination of a question of costs which was in accordance with our decision in The City of Augusta, 80 Fed. 297, 303, 304, 25 C. C. A. 430, an opinion passed down in 1897.

The decree of the District Court is affirmed, with interest and costs in both courts.

NOTE.—The following is the opinion of Dodge, District Judge, in the court below:

DODGE, District Judge. The libelant is owner of the four-masted schooner Sagamore, of Boston. It claims compensation for damage to her in a collision with the Norwegian steamship Edda, at about 8 o'clock in the evening of May 11, 1907, off East Chop, in Vineyard Sound. The schooner, loaded with coal, was bound eastward, for Boston. The steamer was bound westward, for Newark, N. J., with a cargo of plaster rock.

The Edda has, of course, the burden of showing why she did not keep clear of the schooner. She undertakes to show that she was prevented from doing so by failure on the schooner's part to hold her course.

The Sagamore was the larger vessel of the two. Her length over all was 225 to 230 feet, her breadth of beam 44 feet, her draft over 20 feet, and she was of 1,280 tons burden. The Edda's dimensions were 241 feet length, 34 feet beam, she was drawing not over 16 feet, and her tonnage was 1,138 gross, 699 net. The Sagamore carried 10 men all told; the Edda, 14.

Notwithstanding that the Edda was a steam vessel, the Sagamore was moving at the greater speed. With nearly all sail set, she was heading, after passing Nobska, on her own evidence, southeast by east, having the wind on her port quarter, and her booms on her starboard side held off by boom tackles. The tide was running to the southward and eastward, and with her rather than against her. On her own evidence, the allegation of her libel that her speed was nine knots understates rather than overstates it. Most of her witnesses put it at between nine and ten knots. According to the Edda's evidence her speed was from seven to eight knots, and in this particular there seems no attempt to controvert her evidence.

Both parties have regarded the place of collision as in a "narrow channel," and the Edda was required by article 25 of the sailing rules (U. S. Comp. St. 1901, p. 2891), to keep to the northern side of mid-channel, that being the side which lay on her starboard side in passing through. One charge of fault made against the Edda in the libel is that she was "not navigating on the starboard side of the channel" (article 3). According to the libel, the Sagamore's course through the channel was southeast by east, and was "a little on the starboard side of the center of the channel"; the Edda, when first seen, and up to a time "when the vessels approached close to each other," was at all times on the schooner's port bow. showing the schooner her red light only; her green light was shown to the schooner for the first time when the vessels were close to each other; and she then ran directly across the schooner's bow. It is further alleged in the libel that by the collision which followed the schooner was thrown around toward the southern side of the channel, immediately anchored to avoid collision with a barge, and sank, while so at anchor, "nearly in mid-channel." There is no distinct allegation that the Edda was violating article 25 before she showed the schooner her green light, and the allegations referred to render it so difficult to suppose that she could have been much to the southward of mid-channel previous to that time that the charge of violating article 25 might be taken as referring only to her navigation afterward.

If the schooner's course was only a little to the southward of mid-channel, the Edda's original course must have been less so. If the schooner sank nearly in mid-channel, the place of collision could not have been further south than where she sank, and the Edda must have been further north than the place of collision before she showed the schooner her green light.

The channel referred to lies between Hedge Fence Shoal on the north and East Chop and Squash Meadow Shoal on the south. What should be regarded as its northern and southern limits, respectively, for the purposes of this case, is in dispute. There can be no dispute about the position in it of the schooner after she sank. It is fixed by a buoy afterward placed near the wreck and marked on the Coast Survey chart. It is somewhat to the southward of mid-channel, if the channel be regarded as including the whole distance between the buoy off East Chop and the nearest point of Hedge Fence Shoal as shown on the chart. It is, however, not further to the southward of mid-channel than I think the schooner must have gone in that direction after the collision, on the evidence relating to that question. The testimony from the Edda is that she entered the channel by passing to the northward of the gas buoy off the eastern end of Hedge Fence Shoal, and that she did so does not appear to be seriously questioned. If so, and if the place of collision was not south of mid-channel, as I think it could not have been, my conclusion must be that the Edda's course before the collision did not violate article 25, whatever be taken as the boundaries of the channel. As will appear, she admits having starboarded her helm to avoid the schooner. Whether she ought to have ported it instead, in view of article 25, or for any reason, is a different question.

The conflict upon which the case really turns is that which exists between the differing accounts of the approach of the two vessels given in the libel and in the answer. The libel, as has been stated, puts the Edda on the schooner's port bow, showing the red only of her two sidelights, until the vessels are at close quarters, and charges her with then bringing about collision by a sudden change of course to port under a starboard helm, such as to run her across the schooner's bow. According to the answer, the Edda had the schooner during this time on her starboard bow, and except for a short period after she was first sighted during which both her lights were visible, showing the green light only, and the vessels would have passed each other starboard to starboard, had not the schooner prevented it by swinging to starboard directly toward the Edda under a port helm, showing both lights, until she struck the Edda's starboard side somewhat aft of amidships. Both parties agree that the Edda's starboard side was struck by the schooner about amidships.

The conflict between these two accounts is irreconcilable. If the Edda bore over the Sagamore's port bow, and her red light only was there visible, she could not possibly have had the Sagamore over her own starboard bow showing a green light only. The acceptance of either account as true involves the conclusion that the witnesses who support the other are either falsifying or mistaken. According to the witnesses from the Edda, the vessels would have passed each other starboard to starboard, had not the schooner made her change of course to starboard, and according to the schooner's witnesses the vessels would have passed each other port to port without collision, but for the change of course to port by the Edda. A conflict of testimony of this type is not uncommon in collision cases, when the vessels have approached each other on nearly opposite parallel courses. In such cases the witnesses from each vessel are not infrequently found to locate the other over the bow of their own vessel opposite to that over which she must, in fact, have borne if the witnesses from on board the other are to be believed. It would seem that mistake in determining the true bearing of another vessel so approaching is easily possible without attentive care in observation.

The witnesses from the Sagamore include the entire watch on deck at the time; also the mate, who, though not on duty, says that he came on deck before the collision. The captain, whose watch it was from 6 to 8 o'clock, was on the quarter-deck, near the wheel. In his watch were the second mate, who was engaged in clewing down the mizzen topsail, and two colored seamen; one of them steering, the other on lookout forward. The man on lookout had partly lost the sight of one eye. The captain and both mates testified in per-

son at the trial. The lookout and man at the wheel gave their depositions out of court.

The man on lookout testified that he saw first the masthead light of the Edda, and next her red light, both bearing over the schooner's port bow. Some time after reporting the steamer's red light, he "saw her cut across our bow. we struck her, and as we were striking I lit off the forecastle head." The shock of collision knocked him down near the mainmast, on his way aft. The steamer's green light he never saw at all.

Evidently the green light must have been at some time shown, if the steamer "cut across the schooner's bow from a position in which her red light was the only side light visible, and on the schooner's port bow." There must, of necessity, have been a time when both side lights were visible on the schooner, and a further time during which the green light only was visible. But the lookout is not the only one of the schooner's witnesses who failed entirely to see these changes. No one on the schooner saw the green light at all until after the collision. The man at the wheel says he never saw any of the steamer's lights, except her masthead light. The captain, though he got up on the poop deck forward of the wheel to observe the steamer through his glasses, says he saw her masthead and red light a point and a half on the schooner's port bow, and felt sure she was going to pass clear of the schooner to windward until she had got close to the schooner, when he saw her keep right off toward the southern side of the channel, and in a few seconds—"just like a flash"—the vessels were together; but he never saw her green light at all until after the collision. The statements of the only other man in the watch, the second mate, are that he went forward after the steamer was first reported, saw her masthead and red light two points at most on the port bow, went aft again, and set to work clewing down the topsails, until the captain exclaimed, "She is crossing our bow." Dropping the clew line, he then ran forward to the forecastle head, and found the steamer right across the schooners' bow, not 25 feet from the jib boom. It was then that he saw the green light for the first time on the schooner's starboard bow. As to the first mate, he testifies to having seen the steamer's masthead light a point at most on the port bow, 20 minutes before the collision, after which he went below and stayed there until he heard the captain cautioning the man at the wheel: "Look out for your steering. There is a steamer that is acting queer." Jumping on deck, he saw the steamer's hull and masts nearly ahead, and saw her masthead light, but noticed no other light on her until after the collision.

There were other vessels in the vicinity at the time which may well be supposed to have been occupying some of the attention of those in charge of both the colliding vessels. The tug Paoli, towing four barges, was passing through the same channel, in the same direction with the schooner, and, like her, meeting the Edda, though her course and that of the barges was considerably nearer to the East Chop side of the channel than the course of either colliding vessel. Between each two vessels of this fleet there was at least 175 fathoms of hawser. The first barge after the tug was the Wayne, the Radnor came second, the Haverford third, and the Devon fourth and last. All these vessels had passed West Chop ahead of the schooner; but the wind had enabled her to gain upon them between there and East Chop, and at the time of the collision she had passed the Devon and reached a position opposite a point about half way between the Devon and the Haverford, next in line ahead. The master of the schooner admitted that he was watching the barges more closely than the steamer.

Failure on the part of the persons in charge of the schooner's navigation to observe the approaching steamer with proper care is therefore manifest upon their own evidence. It is, of course, true that, if the schooner held her course without change, the fact that she was not keeping a proper lookout does not constitute contributory fault on her part as against a steamer; but in determining which of the two conflicting accounts above referred to is the true one, or which of the two sets of witnesses is most likely to have mistaken the true bearing of the other in a case like this, the fact that the schooner's witnesses paid so little attention to the exact manner of the steamer's approach is a fact which must weigh strongly against her.

I do not think it can be said that the like want of care in observation of the

schooner appears from the evidence of the persons in charge of the steamer's navigation. Her watch on deck consisted of the chief officer and man at the wheel, both on the bridge, and of the man on lookout, on the forecastle head, about 120 feet forward of the bridge. They had been on duty since half past 7 by their time. When they came on duty, the Edda had passed Cross Rip, but had not yet reached the gas buoy. The captain was also on the bridge during the same period. The captain, chief officer, and lookout, all Norwegian, testified at the trial in English, which they spoke fairly well. Captain and first officer had been long enough engaged in making similar voyages to be familiar with navigation through this channel. The man at the wheel, also Norwegian, testified at the trial through an interpreter. He was only 17 years old, and only 5 feet 3 inches in height. Comment was made in argument upon his youth and presumed inexperience. It appeared that he had been 4 months on a school ship, 2½ years at sea, and was shipped as an ordinary seaman, at $16 per month. His management of the helm at the time of the collision was under the immediate charge, and with the assistance, of the chief officer. It cannot be said that the wheel was obviously in incompetent hands.

The man at the wheel saw none of the lights on the approaching vessels. If the lookout and the two officers on the bridge are to be believed, the Paoli's towing lights were the first vessel's lights seen after the Edda passed the gas buoy. The tug was reported on the port bow, her lights and those of the barges were observed from the bridge, and it was recognized that a tug and barges were to be passed in the channel, port side to port side. The schooner was next reported on the Edda's opposite or starboard bow. Both her lights were visible. The captain and chief officer on the bridge made them about half a point on their starboard bow. The sails of the schooner, as well as her lights, were seen, according to the evidence; and, if the night was clear, it would seem that this may well have been the case. Sunset on May 11th was at 6:53 p. m., by the almanac, and the steamer was headed toward the western sky. From what was seen of the vessel or her lights, she was judged to bear on the starboard bow, and to be headed to pass to the northward of the Edda. The schooner's red light next disappeared, the green light alone remained visible on the Edda's starboard bow, and the vessels continued to approach in this manner for some minutes; the green light broadening on the Edda's starboard and no danger of collision with her appearing. The Edda, if these were the facts, was necessarily steering so as to pass between the tug and barges and the schooner. When the Edda had passed the Paoli, and was nearly opposite the first of the barges which were following her, the red light of the schooner began to appear again with the green. She was seen to be falling off toward the Edda, and at this the Edda's wheel was starboarded, so that she was kept off to port and headed for the last of the barges passing on her port hand. Notwithstanding alarm blasts twice given on the Edda's whistle, the schooner continued to swing toward her until she struck her starboard side, as has been described, at a considerable angle across the Edda's course, which had then been changed not more than two points from that which she had been steering while the green light had been the only one seen. When the schooner was seen to be keeping off, the signal for full speed astern had been rung to the engine room, but instantly countermanded before being acted on, so that the Edda was under full speed ahead at the collision. To have reversed the engine would have thrown the Edda's bow to starboard or toward the schooner. At no time was any sudden change of course made, placing the Edda directly across the schooner's course, as claimed by the witnesses from the schooner. Such, in substance, is the account of the collision given by the two officers and lookout of the Edda, the three witnesses from on board her who claim to have been observing it.

Careful consideration of their testimony reveals some discrepancies in it, the most important of which seems to me to be that, according to the captain, the Edda's wheel was first starboarded while both the schooner's lights were visible, before she shut out her red light, in order to give her abundant room. According to him there was a slight gradual change of the Edda's course toward the tug and barges as she got down into the schooner's vicinity, before the schooner was seen to be swinging off, not amounting to more than half a point, followed by a further change in the same direction when the first indi-

cations of the schooner's change were noticed. The chief officer mentions no starboarding until after it was noticed that the schooner was beginning to swing. Both agree, however, that the steamer was never headed further to port than to be pointing for the last barge in the tow, and, if so, the entire change of course by the Edda must at most have been comparatively small. It appeared that after the collision the captain had been the only man from the steamer to get aboard the schooner, where he declared that his vessel was sinking (as she in fact was), and attempted to lower one of the schooner's boats. It was argued from this fact, and from the facts that alarm blasts were twice sounded on the steamer's whistle, and the signal to the engine room instantly countermanded, that the captain must have been in a state of confusion or alarm sufficient to disturb his judgment, and some indications of nervous agitation given by him while on the stand were commented on. But, after giving to all such considerations the weight to which in view of all the circumstances they seem entitled, I am still of the opinion that on the whole the account given by the witnesses from the Edda is the one most likely to be reliable.

It is certainly the one which involves less improbability than the other. The schooner's account requires a very considerable change of course on the Edda's part, and requires it to be made so rapidly that the attention of no one on the schooner was attracted until it was made. The Edda's account requires a much less change of course on the schooner's part, and one occupying time enough to permit its beginning and progress to be observed on board the Edda, and alarm blasts to be twice sounded on her whistle in warning against it, before it was completed. The difficulty of understanding why the schooner should change her course, and change it toward the barges, over whichever bow she had the Edda, cannot be denied; but there is at least equal difficulty in understanding why the Edda should change her course in that direction in the manner claimed by the schooner, and the difficulty is particularly great if it be supposed that she was on the schooner's port bow at the time she made it. To convict her of crossing the schooner's bow, and placing herself directly across the channel course, toward the barges, sounding alarm blasts meanwhile, stronger evidence is needed, as it seems to me, than is furnished by the witnesses from the schooner, notwithstanding the presumption in that vessel's favor.

No direct reference has yet been made to a part of the evidence which consists of testimony from on board some of the barges in the Paoli's tow, and the Carlisle, a tug which was following the Paoli and her barges, and was not far astern of the barge Devon when the collision happened. The libelant called as witnesses the master of the barge Haverford, the master of the barge Devon, and his wife. The respondent called the master of the barge Radnor, the engineer of the barge Devon, and the master of the tug Carlisle. The case is one of the kind in which the court may well resort to and depend largely upon the testimony of witnesses not identified with either vessel, as in The Annie J. Pardee (D. C.) 25 Fed. 155, and The Charles H. Trickey, 66 Fed. 1020, 14 C. C. A. 225, for the purpose of determining which of sharply conflicting accounts given by the crews of the two vessels has the best claim to belief.

Taking the statements of these witnesses as given at the trial, and without regard to the question whether different statements had at any time been made by any of them, I am of opinion that the weight of their evidence decidedly tends to confirm the account of the collision given by the Edda's officers and lookout. Capt. McMahon of the Devon was below before and at the time of the collision, and his testimony relates to the position of the two vessels while they were together. His wife and the engineer were together in the Devon's pilot house. According to the engineer's testimony, which I must upon questions of this kind prefer to that of Mrs. McMahon tending to contradict it, the Edda, when abreast of the Paoli, was showing her green light to the schooner, or possibly both her lights. She was heading so as to pass about half way between the schooner and the barges, and there was plenty of room for her to pass between them. Hearing the alarm blasts from the Edda, he noticed that the schooner had changed her course and was heading for the tow. At the collision she had changed it apparently under a port

helm so far as to be heading "right south." He could see her hull "broadside to us." The steamer had deflected only a little from the course on which she appeared to be before the alarm whistles were sounded. The Devon was the nearest vessel to the collision. Capt. Nolan, of the Haverford, ahead of the Devon, says only that he did not see the schooner make any change of course. But neither did he see any change on the part of the Edda. Capt. Martinolich, of the Radnor, ahead of the Haverford, and Capt. Cooper, of the Carlisle, astern of the Devon, looking on from their different points of view, agree that the Edda before she whistled could safely have passed between the schooner and the tow if the schooner had held her course, that the schooner afterward swung rapidly toward the tow under a port helm, and that until she did this her course was to windward, or to northward of the course of the Edda. These are the important features of the testimony, and none of the criticism upon details of the evidence coming from the respective witnesses has seemed to me sufficient to qualify the general effect.

My conclusion must be that the schooner did change her course to starboard and thereby bring about the collision, notwithstanding the testimony of the man at her wheel that after the course southeast by east was given him it was never changed at all, that the schooner never varied from it more than one quarter of a point, that he did not leave the wheel until after the collision, and that at the collision southeast by east by the compass was the course he was on. This testimony and that of her first mate, that after he came on deck, and while the vessels were on the point of coming together, he stood by the wheel until the schooner's jib boom was right over the Edda and the vessels were within 30 or 40 feet of each other, that he then looked at her compass before running forward, and saw that the schooner's course was southeast by east, I should be obliged to regard with some suspicion, in any event, in view of all the circumstances which appear. It is outweighed, in my judgment, by the evidence tending to contradict it, upon which I have relied.

It is to be observed that, of the independent witnesses who have testified, Capt. Nolan, called by the libelant, agrees with Capts. Martinolich and Cooper called by the respondent, that the barges and the Carlisle were about in mid-channel. This tends strongly to support the conclusion already stated that the Edda's course was to the north of mid-channel and the further conclusion that the Sagamore's was still further to the northward.

The rule requiring a steamer to keep clear of a sailing vessel by a safe margin of safety cannot, of course, be applied to its full extent in a case like this, where so many vessels are obliged to pass each other at once, and all within narrow limits. If, as I think the conclusion must be, on the evidence, there was room enough for the Edda to pass between the schooner and the towing fleet in safety, had the schooner held her course, she cannot be condemned merely for making the attempt. She had the right, in attempting to keep clear of the schooner, to go on either side of her, unless some special danger forbade. To attempt to pass the schooner on the other side involved, on the facts as I find them, crossing ahead of the schooner at some distance, whether greater or less. The master of the Edda gave also as his reason for not doing so his desire to keep outside the sector within which Nobska Light shows red. The location of this sector was obviously for the purpose of warning vessels within it of their proximity to Hedge Fence Shoal. Without deciding that this sector forms the northern limit of the channel, or that a rule of navigation could be safely violated for the mere purpose of keeping outside it, I do not think the Edda's captain can be said, on the evidence, to have overestimated the danger of getting within it, or to have done anything for which he ought to be held in fault through fear of that danger.

If I am right in concluding that the account of the collision testified to by the Edda's witness is the true one, the evidence affords no ground for holding the Edda in fault. The libel against her must therefore be dismissed, with costs.