COMMONWEALTH & DOMINION LINE, Limited, v. SEABOARD TRANSP. CO.

(District Court, D. Massachusetts. July 1, 1919.)

No. 1674.

1. COLLISION ⬉⚊90—"NARROW CHANNEL"—VINEYARD SOUND.

Vineyard Sound, at the point of a collision at night, where as delimited by the red sectors, it is about seven-eighths of a mile wide, *held* a "narrow channel" within article 25, International Rules, Act Aug. 19, 1890 (Comp. St. § 7864).

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Narrow Channel.]

2. COLLISION ⬉⚊104—VIOLATION OF RULES—PRESUMPTION OF FAULT.

The presumption of fault against a vessel by her violation of the statutory rule by being on the wrong side of a narrow channel is not conclusive, and she may be exonerated where the other vessel is seasonably apprised of her intention to stay there and might have avoided collision by proper navigation.

3. COLLISION ⬉⚊57—TUG WITH TOW—UNNECESSARILY LONG TOW.

A tug does not acquire anything in the nature of privilege against other vessels by taking on an unnecessarily long tow.

4. COLLISION ⬉⚊95(7)—MEETING STEAMSHIP AND TOW—MUTUAL FAULTS.

A collision in Vineyard Sound at night between a tug with a long tow and a meeting steamship *held* due to faults of both vessels, the tug for being on the wrong side of the channel and approaching such side and persisting in such course after seeing the steamer without warning her, and the steamship being in fault for proceeding at full speed although uncertain as to the course of tug.

In Admiralty. Suit for collision by the Commonwealth & Dominion Line, Limited, owner of the steamship Port Hunter, against the Seaboard Transportation Company, owner of the tug Covington. Decree dividing damages.

Putnam, Putnam & Bell and Lord, Day & Lord, all of New York City, for libelant.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for respondent.

⬉⚊For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

MORTON, District Judge. This suit arises out of a collision between the steamship Port Hunter, a large freighter, and the tug Covington, which took place in Vineyard Sound about 1:45 a. m. on November 2, 1918. The Port Hunter was so injured that she was beached on Hedge Fence shoal to prevent sinking and will probably be a total loss. She was valued at about $700,000. The value of the tug and her pending freight is, by agreement, $100,000, to which sum the liability of the respondent has been limited.

The Port Hunter, fully loaded, was on passage from Boston to New York to join a convoy. She reached Hedge Fence light vessel, near the eastern end of Vineyard Sound, at about 1:30 a. m., and left it about 1,000 feet on her starboard side. Changing course slightly to the north, she proceeded up the Sound. Her speed was about 10 knots through the water, and, the tide being 2 knots in her favor, about 12 knots over the ground. Her lights were properly set and burning. The night was clear, moonless, and star lit, with a moderate northwesterly breeze, and not much sea. The set of the tide in the lower part of the Sound was almost directly with the steamer. Farther to the west it draws towards West Chop and the Middle Ground Shoal.

The Covington was bound east with two loaded barges in tow. Her course, according to her testimony, had taken her well up toward the buoys off Nobska, and she had left them about 1,200 feet on her port side when she made the turn toward the southeast to go down the Sound. The hawsers connecting the tow aggregated about 1,950 feet in length, and the complete tow was nearly half a mile long. There was no necessity for any such length. It might have been shortened half, if not two-thirds, without disadvantage, except possibly a slight reduction in speed. After making the turn, the tug kept well over towards the red sector of Nobska light and proceeded on a course about east southeast, making about three knots per hour over the ground. She was nearly abreast West Chop when the steamer rounded Hedge Fence light vessel, as above described, about 5 miles distant. Shortly thereafter, each vessel, according to her own testimony, discovered the other; and, for a distance of at least 3 miles as they approached, each had the other under continuous observation. Up to this point there is no great controversy as to the facts. Beyond it, as is not uncommon in collision cases, there is irreconcilable conflict between the testimony offered for the steamer and that for the tug.

[1] The weightiest allegation of fault against the tug is that Vineyard Sound at the place of collision is a narrow channel within article 25 of the Inland and International Rules (Act Aug. 19, 1890, c. 802, § 1, 26 Stat. 327 [Comp. St. § 7864]), and that she was proceeding upon her wrong side of it.

The navigable width of the Sound at the place of collision is about a mile and a quarter. At night both sides are delimited by red sectors from West Chop lighthouse on the south and Nobska on the north. Between these red sectors there was, at the place of collision, about seven-eighths of a mile. Farther down near Hedge Fence lightship there is a distance between them of about half a mile. It would

not be prudent navigation at night to go into the red sectors, although a pilot well acquainted with those waters might go into the "tinged" line. The tinges would add slightly to the widths just stated, but not enough to effect the present question. The length of this part of Vineyard Sound from abreast West Chop to Hedge Fence lightship is about five miles. There can be no doubt that navigation in it is restricted by dangers on both sides. The practical difficulties which the respondent suggests in applying the narrow channel rule, viz., the approach from the open ocean, the strong tidal currents, the existence of harbors into which vessels might be turning, and so forth, are not peculiar to this waterway and are found on many bodies of water which have been held to be narrow channels. The narrow channel rule has its advantages and disadvantages, and the aim of the courts is to apply it to waters where the advantages preponderate. Where navigation is constricted into a stream of traffic, it is, generally speaking, advisable to apply the rule. In The Alfred W. Booth (D. C.) 127 Fed. 453, Judge Holt has made an interesting review of well-known waterways which have been held narrow channels.

In The Edda, 173 Fed. 436, 97 C. C. A. 638, the place where this collision occurred was regarded by both parties and by the court as a narrow channel to which article 25 applied. On all the evidence I find and rule that Vineyard Sound at the place of collision was a "narrow channel" within the meaning of article 25 of the Inland and International Rules.

[2] There is no doubt that the tug was near the Nobska sector, well over on her wrong side of the channel, where she had no right to be as against an approaching vessel. Being there, instead of giving way, she actively adhered to her position. She was, according to her own evidence, headed slightly toward her port side of the channel and was progressing in that direction; and she continued to hold that course after the Port Hunter's lights had become visible to her.

This was a direct violation of article 25 and a statutory fault which throws upon the tug the burden of showing that it unquestionably did not enter into the collision. The presumption of fault from a violation of statute is not conclusive; the burden of proof which it throws upon the offending vessel, though heavy, may be met. A vessel may be so established in her course on the wrong side of a narrow channel, and may so clearly and seasonably indicate to an approaching vessel her intention to stay there, that, if the other vessel have ample opportunity to size up the situation and avoid her, and does not do so, but brings about a collision through her own negligence, the statutory violation is regarded as a mere condition, and the accident as due wholly to the negligence of the vessel which failed to avoid it when she had a clear chance to do so by the exercise of reasonable care. The Clara & Reliance, 55 Fed. 1021, 5 C. C. A. 390.

Such severe requirements for exculpation can, however, but seldom be met. If the approaching vessel acted not unreasonably on the assumption that the other vessel would give way and maneuvered accordingly, or was confused and embarrassed by the other vessel

holding to its wrongful course, exculpation is not made out. The decisions collected in a footnote [1] indicate how reluctant courts have been to exonerate vessels violating statutory rules of navigation. This tendency seems sound and to apply with peculiar force to violations of the rule in question. Marsden, Collisions at Sea (6th Ed.) p. 441. The conditions of modern traffic both on sea and on land are emphasizing the importance of the right-hand rule. "The Golden Rule of navigation is to keep to the right." Haynes, Rule of the Road at Sea (2d Ed.) p. 71.

[3] The Covington had taken her port side of the channel, because, with her long tow, it was to her advantage to do so; but this advantage was not a necessity. Even with her tow as long as it was, and notwithstanding the southerly set of the tide, she could have gone safely on her starboard side of the channel, and by shortening the tow she could have gone well over towards the other edge. Whatever may be the law in the Fourth circuit, it has never been established in this circuit that a tug acquires anything in the nature of privilege against other vessels by taking on an unnecessarily long tow.

[4] On the tug's own testimony, she gave no indication to the steamer that she intended not to give way until just before the steamer made her sudden turn to starboard. The vessels were then so close together as to be almost in extremis. If the tug had given her two-blast signal when they were far apart, and when the steamer still had ample opportunity so to maneuver as to avoid the tug, the case would be very different. Whether the evidence for the tug be accepted and the collision be regarded as the result of a sudden, confused movement of the steamer across the tug's bow, or whether the steamer's evidence be accepted and the collision be regarded as the result of an effort by the tug to hold her course across the steamer's path in violation both of article 25 and of article 19 (Comp. St. § 7858), the result seems to me the same. The steamer was not trying to wreck herself or to sink the tug; she was trying in good faith to avoid collision; and for that purpose went to starboard. Her movement was caused by the persistence of the tug in holding a course which it had no right to take, and in failing seasonably to make clear to the steamer its intention so to do.

On all the evidence I find and rule that the Covington was at fault for being on her wrong side of a narrow channel, and that she has failed to establish that such fault did not enter into the accident.

As to whether the steamer was also at fault: On her own evidence she held her course and her speed of about 12 knots towards an approaching vessel whose sidelights she had not yet made out, until she had come so close to the other vessel that immediately upon the discovery of the green sidelight the situation was an emergency.

---

[1] Footnote: The Victory, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519; The Vanderbilt, 6 Wall. 225, 18 L. Ed. 823; The Bay State, Fed. Cas. No. 1,149, 3 Blatchf. 48; The Marcia Tribou, Fed. Cas. No. 9,062, 2 Spr. 17; Occidental, etc., S. S. Co. v. Smith, 74 Fed. 261, 20 C. C. A. 419 (C. C. A. 9th Cir.); The Milligan (D. C.) 12 Fed. 338; Green v. The Helen (D. C.) 1 Fed. 916.

This the steamer ought not to have done. The facts that she was well over on her right side of the channel and had the right of way, and perhaps assumed that the other vessel would yield, do not justify her in getting into such close quarters at such speed with an approaching vessel of whose course she was uncertain. Judge Benedict took a similar view of a somewhat similar situation in The Austin, Fed. Cas. No. 663, 3 Ben. 11. Upon all the evidence I find and rule that the steamer was at fault for approaching too closely and at too high speed a vessel whose sidelights and course she had not made out.

These findings are sufficient to dispose of the case. In view of the possibility of appeal, I ought perhaps to add—as I saw many witnesses—that in my opinion the Port Hunter's course from the lightship probably was such that both her sidelights were visible to the tug at the time when the latter gave her two-blast signal, and that at all times after rounding the lightship the steamer had the tug over her port bow, as she says. In the irreconcilable conflict of testimony, I am led to these conclusions largely by my inferences from the clearly established facts. The place of collision is not greatly in dispute. It was not far from the northerly end of the smaller mark which McCollum (mate of the tug) placed upon the chart; i. e., it was far over on the steamer's right side of the channel. Nobody testifies that the Port Hunter ever changed course to port after rounding the lightship. Her witnesses say she made two slight deviations to starboard. Whether she did so, or whether she went straight to the place where she made her last turn, makes little difference. Her red light would have been visible to the tug. It is difficult, if not impossible, to give the steamer any course from Hedge Fence lightship that would close her red light to the tug, except upon the assumption that she went a long distance to starboard on her last swing. It seems highly improbable that a vessel with wide clearance from an approaching vessel on her right and plenty of room on her left would turn short across the bow of the on-coming vessel, as the tug's witnesses say the steamer did—in which they are contradicted by the witnesses for the steamer. The tug's lookout was away from his post during critical minutes preceding the collision, and the men on the barges were under no responsibility for the navigation of the tug. The last movement of the steamer undoubtedly carried her somewhat to starboard of her previous course; but I do not think that the distance was as great as the Covington contends, because I think that the vessels were pretty close together when the movement began. This is strongly indicated by the testimony of the engineer of the tug, who says that from 30 seconds to a minute elapsed between the reverse signal and the shock of the collision. The reverse signal was given as soon as the steamer's movement was observed on the tug. The engineer, not being on deck and his attention not being distracted by the impending collision, was much better placed to judge time correctly than the witnesses on deck. All agree that it is extremely difficult to judge distance on the water at night with accuracy. If the two vessels were on crossing courses and close to-

gether, it is by no means impossible for them to have collided as they did upon a turn to starboard by the steamer.

The two-blast signal was given by the tug under article 18 (Act June 7, 1897, c. 4, § 1, 30 Stat. 100 [Comp. St. § 7892]), according to which it ought not to have been sounded unless both sidelights of the approaching vessel were visible. This is an indication—and I think a strong one—that McCollum saw both the steamer's sidelights, and was holding his course and leaving the other vessel to do the maneuvering to avoid collision. It is in keeping with his conduct in not shortening the tow as he entered this narrow, frequented, and dangerous waterway. Since the abolition of the regulation restricting the length of tows, unlimited length is not illegal; but the dangers which occasioned that regulation are still present, and an unnecessarily long tow constitutes an avoidable menace to other vessels. I do not think that the pilot of the steamer was the worse for liquor before the collision. Whether the steamer could have cleared the barges if she had gone to port, instead of to starboard, is so uncertain that, considering the wide latitude of action permitted in an emergency, I am by no means prepared to hold that the hard aport order was at fault.

The underlying cause of the collision appears to be that the night was so fine and the approaching vessels were so plainly visible to each other, and there was such ample room to clear each other, that the officers of neither had in mind any danger of collision, did not realize how close the courses of the vessels were bringing them, and took no steps to avoid collision until too late.

Decree that each vessel was at fault and for divided damages.