## MERCHANTS' & MINERS' TRANSP. CO. v. NOVA SCOTIA S. S. CORPORATION.

### No. 2422.

Circuit Court of Appeals, First Circuit. April 18, 1930.

See, also, 36 F.(2d) 833.

Stephen R. Jones and Foye M. Murphy, both of Boston, Mass. (Thaddeus H. Swank, of Baltimore, Md., on the brief), for appellant.

Arthur J. Santry, of Boston, Mass. (Frederick Fish, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, ANDERSON and WILSON, Circuit Judges.

ANDERSON, Circuit Judge.

These cross-libels grow out of a collision between the steamships Evangeline and Grecian, in Pollock Rip channel, about 11:58 or 11:59 p. m. (daylight saving time) on June 28, 1928. The Evangeline was going east from New York to Yarmouth, Nova Scotia. She is a new steel steamship, with turbines, 365 feet long, of 5,043 gross tons, launched in 1927. The Grecian was a freighter bound from Boston to Norfolk. She was an old, steel, single-screw steamer, with reciprocating engine, 263 feet long, of 2,827 gross tons. When the ships collided, a tide of about 2 to 2½ knots was running against the Evangeline and with the Grecian. The weather was then thick fog, smooth sea, and southwesterly wind of from 11 to 15 knots. The ships came together, port to port. The Evangeline was but slightly damaged; she was struck about 12 to 15 feet from the bow, and barely scratched 25 to 30 feet; below the water line she had on the bulb of her bow a small dent. The Grecian was struck about 50 feet from her bow, scraped about 140 feet, puncturing her plates, and so crippling her as to require her beaching on Monomoy Point a few minutes after the collision. After turning and ascertaining that the Grecian did not require her assistance, the Evangeline resumed her way toward Yarmouth.

The case was tried for three days in October, 1929, before District Judge Lowell. Twenty-four of the twenty-five witnesses appeared before him; only one deposition was taken—that of Capt. Jones of the Dorchester, another vessel of the appellant that left Boston a few minutes later than the Grecian, and followed her about a mile and a quarter away. Capt. Jones thus knew nothing about the crucial facts concerning the collision; his evidence is mainly directed to the fog conditions and to courses in Pollock Rip channel.

The evidence is irreconcilably conflicting. There would have been no collision if both vessels had been navigated as their respective officers and crews testified. In the main, the issue is one of credibility. It is therefore peculiarly a case for attaching great weight to the findings of the trial court—who saw all the important witnesses. The Orion (C. C. A.) 26 F.(2d) 603; The Lake Monroe (C. C. A.) 271 F. 474; The Perry Setzer (C. C. A.) 299 F. 586. Moreover, in this case, Judge Lowell is stated (without denial) to have had the evidence written out and to have read it before the case was argued before him, some thirty days after the trial. His conclusions should be adopted by this court—in which an admiralty case is tried de novo—unless plainly wrong. Lake Monroe, supra; The Parthian (C. C.) 48 F. 564; The Alijandro (C. C. A.) 56 F. 621; Alaska Packers' Ass'n v. Domenico et al. (C. C. A.) 117 F. 99, 101. On November 20, 1929, Judge Lowell filed a memorandum, reading:

"I find that the Grecian was solely at fault for this collision. She was too far over on the southerly side of the channel. Her witnesses testified that she had been going astern for four minutes under a hard-a-port helm. The wind was of the velocity of about eleven miles from the southwest. I find that if she had been going astern for four minutes with the wind southwest she would not have been headed as she was at the time of the collision. I also find on the evidence that at the time of the collision she had not gathered sternway, but was still coming ahead under the influence of the westerly tide, which had a velocity of about two knots. I find that the Evangeline, which had the tide against her, was stopped."

Decree accordingly was entered on November 27, 1929, from which the owner of the Grecian duly took this appeal.

Sharply contrasted with this finding that the Evangeline "was stopped" was the evidence of the Grecian's witnesses that the Evangeline was proceeding at a speed of 10 to 12 knots an hour. The trial court was fully warranted, on all the evidence, in disbelieving the Grecian's witnesses on this point.

The appellant contends that the Evangeline was at fault under the 25th Inland Rule, 33 USCA § 210, art. 25: "Art. 25. In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel," in failing to keep to the starboard side of a nar-

row channel. This contention cannot be sustained. The District Court expressly found that the Grecian "was too far over on the southerly side of the channel," meaning obviously on the Grecian's port side of the median line of the channel. The evidence fully supports this finding, however the channel be defined. As learned counsel on both sides, specialists in admiralty, stoutly argue that the collision took place in a narrow channel, and as the court below apparently so found, it is enough now to hold that appellant's seventh assignment—that "the steamship Evangeline was at fault for proceeding on her port side of a narrow channel"—is without merit. Commonwealth & Dominion Line, Ltd., v. Seaboard Transp. Co. (The Port Hunter) 258 F. 707 (D. C.); Id. (D. C.) 275 F. 617; The Edda (C. C. A.) 173 F. 436; The Yarmouth (D. C.) 100 F. 667; The Alfred W. Booth (D. C.) 127 F. 453.

The closest question in the case is whether the Evangeline complied with article 16 of the Inland Rules (33 USCA § 192), reading: "Every vessel shall, in a fog, mist, falling snow, or heaving rain-storms, go at a moderate speed, having careful regard to the existing circumstances and conditions," as construed and applied in such cases as The Nacoochee, 137 U. S. 330, 11 S. Ct. 122, 34 L. Ed. 687; The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053; The Chattahoochee, 173 U. S. 540, 548, 19 S. Ct. 491, 494, 43 L. Ed. 801, where the court said: "It has been said by this court, in respect to steamers, that they are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law."

A recent excellent statement of the rule is that of Judge Learned Hand in Steffens v. United States (The Aalsum) 32 F.(2d) 206, 207 (C. C. A. 2), where he says: "We are concerned only with the faults of the Aalsum, which are charged to be, first, an 'immoderate' speed; and, second, failing to stop her engines upon hearing the Dannedaike's signals—both violations of article 16, as it has stood since 1889. *The first depends upon whether she could stop her way with such visibility as existed after sighting another vessel.* The Nacoochee, 137 U. S. 330, 11 S. Ct. 122, 34 L. Ed. 687; The Manchioneal, 243 F. 801 (C. C. A. 2); The Haven, 277 F. 957 (C. C. A. 2); The Esperanza (C. C. A.) 16 F.(2d) 945. *That duty is, however, correlative with the duty of the other vessel to do the same.* The Umbria, 166 U. S. 404, 417, 17 S. Ct. 610, 41 L. Ed. 1053. The rule is not theoretically adequate in all cases; though each vessel be in such reserve that she can check her way before she reaches the place at which the other appears, it does not follow that they cannot collide. The point of meeting may be such that they will both reach it, though each could have stopped before reaching the place where she could first have sighted the other. However, it is the only practicable rule, and it is the law." See also Lie v. San Francisco, etc., Co., 243 U. S. 291, 37 S. Ct. 270, 61 L. Ed. 726; The H. F. Dimock (C. C. A.) 77 F. 226.

This question must be determined mainly from the evidence of the Evangeline's witnesses; for we reject, as did the District Court, much of the evidence of the Grecian's witnesses as unreliable on the speed of the vessels at the time of the collision. We here note that counsel are in disagreement as to the interpretation of the finding of Judge Lowell that "the Evangeline was stopped." Counsel for the Evangeline say "stopped" means "stopped in all respects," not only over the ground but through the water, which was for her a head tide of about 2 knots. Counsel of the appellant say the finding of the District Court means simply stopped over the ground, thus giving the Evangeline theoretical headway through the water of about 2 knots. They say, further, that in collision cases between vessels under way, "the tide is immaterial." Marsden Mar. Coll. page 436. Compare The Chinook (C. C. A.) 34 F.(2d) 614, 616, where Judge Learned Hand says: "A tide makes no difference in the approach of two vessels, which are both floating in it; it is apparent from a moment's consideration that the acceleration of one is exactly balanced by the retardation of the other, and that when both have seaway the current cannot play any part in the collision."

It must be conceded that the finding of the court below is in that respect ambiguous. But on the weight of evidence we think it must be found that the Grecian was the vessel that had headway, apart from "the influence of the westerly tide." Capt. Lakeman of the Evangeline, who had had 37 years' experience at sea, and was in charge of navigating his ship at all times now material, and was a cautious, accurate, and truthful witness, says that at the time of collision the Grecian "was going ahead. * ⁎ ⁎ She passed our ship. * * * I don't

know as I could say as to her speed. * * * She had headway and passed us."

Hodgdon, first officer of the Evangeline, who has held a license as master on all oceans for 15 years, who was on the bridge from 11:40 p. m. (daylight saving time) or 18 minutes before the collision, says the Grecian "appeared to me to pass by at the rate of 4 or 5 miles an hour."

"Q. 64. Did you have any question but what she had headway on at the time? A. I know she did."

Hersey, the third mate of the Evangeline, who was on the bridge making "notations in the log as to changes of course, etc.," says the Grecian "went by at a speed, I should say, around 4 or 5 knots."

Wooster, who was steersman at the time of the collision, testifies:

"Q. 43. And did you form any opinion at that time as to whether the other ship had way on? A. Yes, sir.

"Q. 44. And what opinion did you form? A. She was going very fast.

"Q. 45. That was the opinion that you formed? A. Yes.

"Q. 46. And how soon did she pass out of sight, Mr. Wooster? A. Immediately."

There also is evidence, from the nature of the damage done by the collision, of weight in determining which vessel had headway. Capt. Lakeman testifies:

"Q. 134. Now, from the damage that was caused to the steamship Evangeline, the extent of it, have you any opinion as to what that shows with respect to which vessel had speed at the time of the collision? A. I have.

"Q. 135. And what is that, captain? A. A vessel laying dead still in the water serves as a bulkhead; and a vessel approaching with speed, holding his helm hard-a-port, strikes and holds the current and the rudder with his speed—holds the vessel against that one spot, as it would against any fixed object or any bulkhead; and he would be the one to receive the damage; he would scrape all the way along in that particular spot.

"Q. 136. If the Evangeline had been proceeding at 10 to 12 knots ahead on a hard-a-port helm, what would the operation of that navigation have been upon the port side of your ship in contact with the steamship Grecian? A. We would have held our side up against his, and we would have been scarred for the entire length of the ship.

"Q. 137. As you swung? A. As we swung, we would throw our stern against his side and hold it there.

"Q. 138. And you would expect to find evidence of damage all along your port side? A. All along the port side.

"Q. 139. If, instead of proceeding at 10 or 12 knots, with the helm hard-a-port, you had been proceeding at any speed ahead, would you have expected evidence of damage on the port side of the Evangeline for the full distance, as you passed the steamship Grecian; I mean, is your answer limited merely to the speed of 10 to 12 knots? A. No.

"Q. 140. That same opinion would hold if you had passed him at any speed? A. We would have had that damage had we been going at any speed, because we would hold up against him.

"Q. 141. You would swing your vessel against him? A. We would be swinging against him."

Capt. Crosby of the Yarmouth, a sister ship of the Evangeline, corroborated Capt. Lakeman as follows:

"Q. 15. Now, assuming that the Evangeline was proceeding at a speed of 10 to 12 knots, under a hard-a-port helm, when she collided with another ship—and I show you Claimant's Exhibit C and Libellant's Exhibit 5, a photograph of the port side of the steamship Grecian. Now, going back, assuming that the Evangeline was going at 11 or 12 knots on a hard-a-port helm, when she collided with the steamship Grecian about opposite the pilot house, what, in your opinion, would have been the damage caused to the steamship Evangeline? A. Why, the Evangeline, with any headway at all, the two ships would come together, and it would have taken the side of the ship out.

"Q. 16. Would you expect to find evidence of damage all along the port side of the steamship Evangeline under those circumstances? A. Yes, sir.

"Q. 17. Do I understand you to say that, as the two ships came together, with the Evangeline under a port helm, proceeding at any speed, the tendency would be to throw her whole side up against the other ship? A. Yes, sir."

Turning now to the evidence concerning the movement of the Evangeline just before the collision: At 11:50 p. m. her engines were put at "half-ahead"; the undisputed testimony is that within two or three minutes this would reduce her speed to 9 knots

through the water, about 7 over the ground. At 11:55 Capt. Lakeman thought he should be within hearing of buoy No. 9; but it had not been heard; the engines were then stopped. Within a few seconds thereafter, bell buoy No. 9 was heard on the starboard, about abeam, and from 300 to 600 feet away. No whistle from the Grecian had then been heard. The course of the Evangeline was then changed from N. E. by E. ¼ E. to starboard ½ point, i. e., to N. E. by E. ¾ E.—so as to leave Stone Horse light vessel well to port. Just then the Grecian's whistle was heard apparently a point or two to the starboard, indicating that the Grecian was some distance to her (the Grecian's) port of Stone Horse light vessel. The Evangeline answered by a single prolonged blast, given by Capt. Lakeman by hand. The Grecian answered by 3 blasts; to which the Evangeline replied with one blast, the legally prescribed signal for vessels in fog not in sight of each other (33 USCA § 191, art. 15, subd. 2 (a); section 203, art. 18, Rule IX). The Grecian again blew 3 blasts and the Evangeline replied with 3 and put her helm hard aport, and both her engines full astern. This was recorded as at 11:56 p. m. But the practice of not noting fractions of minutes leaves the exact time, by seconds, in some doubt; the real time of reversing might have been slightly either before or after 11:56. By the Evangeline's clock the collision was at 11:58; by the Grecian's (kept on standard time) 10:59. This discrepancy of one minute certainly does not help the appellant's case; for, if the collision was later than the Evangeline recorded it, the probability that the Evangeline was stopped in the water becomes greater.

Capt. Lakeman testifies, with a cautious care which gives his evidence credibility:

"Q. 74. At the time of the collision, captain, what was the steamship Evangeline doing with respect to her motion in the water? A. If she was ranging ahead any, it was very, very little; that is, through the water."

Capt. Lakeman corroborated his judgment by a test made within a week of the collision in Long Island Sound:

"Q. 92. Just describe the test and state what the test showed. A. We were proceeding at our usual normal speed, 157 revolutions.

"Q. 93. Then what did you do? A. And then I put my telegraph on 'Half speed' and kept it there for five minutes. Then I put it on 'Stop' for one minute; and then I put it on 'Full speed astern' and kept it there

for two minutes. At the end of the two minutes the ship was brought to a dead stop.

"Q. 94. In the water? A. In the water.

"Q. 95. And the tide was 1½ knots against you? A. The tide was about 1½ knots.

"The Court. I did not get that. How long did it take you to stop—two minutes?

"The Witness. Two minutes, sir. We were backing full speed two minutes.

"Q. 96. How did you determine that your ship was still at the time? A. By looking over the side, looking over the ship's side, from the bridge down to the water. We have a discharge pipe that goes out through the side, and it was dropping straight down.

"Q. 97. The discharge pipe was dropping straight? A. The water was dropping straight down."

While Capt. Lakeman's testimony as to the point of collision and his estimate of the distance from Stone Horse lightship might indicate that the speed of the Evangeline after passing buoy No. 9 may have been greater than he and his officers admitted, deductions as to rate of speed and location of vessels in the water from mathematical calculations, especially in a fog, are not sufficiently conclusive to overcome positive testimony of what occurred, where the happenings were duly recorded at the time. While the question is fairly close, we conclude, without further detailed review of the evidence, that the Evangeline complied with her duty under article 16 of the Inland Rules, supra, "to stop her way with such visibility as existed after sighting another vessel." It must be remembered that "that duty is, however, correlative with the duty of the other vessel to do the same." Steffens v. U. S. (The Aalsum), 32 F.(2d) 206, 207 (C. C. A. 2). In this case, the Grecian did not perform her correlative duty; she had headway apart from the tide; she went by the Evangeline at a considerable speed; this speed was the causa causans of the collision, passing, for the moment, the question of the improper locus of the Grecian on the left of the channel. Even if Capt. Lakeman had put the Evangeline on full speed astern immediately on hearing the three-blast signal of the Grecian, it is fairly clear that the collision would not have been avoided.

Our conclusion that the District Court was correct in holding the Grecian solely at fault for this collision finds collateral support in much other evidence in this record of

nearly 300 pages. Why, under such conditions of fog, dangerous to all vessels navigating that very dangerous coast, the Grecian did not use her wireless—as did the Evangeline and the Dorchester—to notify other vessels of her position and to ascertain what ships she was likely to meet and where, is one among many indications of a lack of such care as the conditions plainly demanded.

Again, all the material entries in the deck log of the Grecian were made after the collision—probably when she was beached on Monomoy Point, and her officers were considering how they could justify themselves for the collision.

On all the evidence the decision below must be affirmed.

The decree of the District Court is affirmed, with costs to the appellee.